NO POWER LINE, INC. (NPL), Save Our Countryside, Inc. (SOC), and Preserve Grant County (PGC), Appellants,

v.

The MINNESOTA ENVIRONMENTAL QUALITY COUNCIL, Respondent,

and

NO POWER LINE, INC. (NPL), Save Our Countryside, Inc. (SOC), and Preserve Grant County (PGC), Appellants,

and

Families Are Concerned Too, Inc., (FACT), Intervenors-Appellants,

v.

The MINNESOTA ENVIRONMENTAL QUALITY COUNCIL, Respondent,

and

Virgil Herman FUCHS, Individually, and on behalf of Counties United for Rural Environment, Inc., aka CURE and all other interested parties, petitioners, Appellants,

v.

The STATE of Minnesota and the Minnesota Environmental Quality Council, an Administrative Agency aka MEQC, Respondents.

and

Russell SCHMIDT, Individually, and on behalf of CURE, Inc., and all other interested persons similarly situated, Appellants,

v.

The STATE of Minnesota, The Minnesota Environmental Quality Council, a State Administrative Agency, United Power Association and Cooperative Power Association, Respondents.

and

COUNTIES UNITED FOR RURAL ENVIRONMENT (CURE), Appellant,

v.

MINNESOTA ENERGY AGENCY, Respondent,

and

STATE of Minnesota By FAMILIES ARE CONCERNED TOO, INC., a Minnesota non-profit corporation, (48043), Appellants,

and

Families Are Concerned Too, Inc., a Minnesota non-profit corporation, in its own name, Appellant,

v.

UNITED POWER ASSOCIATION, a Minnesota Corporation Association; Cooperative Power Association, a Minnesota Cooperative Association; The Minnesota Environmental Quality Council, an Agency of the State of Minnesota; and the Minnesota Energy Agency, an Agency of the State of Minnesota, Respondents,

and

In the Matter of the Application by Cooperative Power Association and United Power Association for a Construction Permit for a High Voltage Transmission Line and Associated Facilities.

Traverse Air, Inc., Appellant-below.

Nos. 48014, 48036 and 48043.

Supreme Court of Minnesota.

Sept. 30, 1977.

George Duranske, Bemidji, for appellants.

David A. Grant and Eleni P. Skevas, Minneapolis, for FACT.

Norton M. Hatlie, Navarre, for Virgil Fuchs et al.

Warren Spannaus, Atty. Gen., Stephen Shakman, Donald A. Kannas and William E. Dorigan, Sp. Asst. Attys. Gen., St. Paul, for State et al.

Dwight Wagenius, Sp. Asst. Atty. Gen., St. Paul, for Minn. Energy Agency.

Roger Miller, South St. Paul, for United Power Assn.

John Drawz, Minneapolis, for Cooperative Power Assn.

Roger Nierengarten, St. Cloud, Lindquist & Vennum, Edward J. Parker, Minneapolis, for intervening farmers in Traverse and Grant Counties.

Thomas C. Athens, Wheaton, for Traverse Air, Inc.

SHERAN, Chief Justice.

Appellants[1] appeal from the final orders of a specially appointed three-judge district court panel[2] composed of Judge Ronald E. Hachey of St. Paul, Judge Charles W. Kennedy of Wadena, and Judge Thomas J. Stahler of Morris affirming decisions of the Minnesota Environmental Quality Council (MEQC)[3] and the Minnesota Energy Agency (MEA) approving the joint construction by Cooperative Power Association (CPA) and United Power Association (UPA) of a high-voltage transmission line (HVTL) from the North Dakota border to Coon Rapids, Minnesota. The panel held that MEQC's designation of a corridor for the HVTL,[4] the later designation of a route within that corridor,[5] and the issuance of a construction permit[6] as well as MEA's grant of a certificate of need[7] for the HVTL were "proper and substantially supported by evidence in the record." The panel rejected the claim that MEQC and MEA had violated the Minnesota Environmental Policy Act (MEPA)[8] and denied appellants' requests to introduce additional testimony and to remand the proceedings to MEQC and MEA. As part of its orders the panel also issued a 10-day stay which was extended by this court until August 25, 1977, the day on which oral arguments were to be presented to the supreme court sitting en banc.

Appellants are a number of farmer-citizen organizations formed over the past few years in response to the proposal by CPA/UPA to construct a HVTL across this part of Minnesota. No Power Line, Inc. (NPL), Save Our Countryside, Inc. (SOC), and Families Are Concerned Too, Inc. (FACT) are Minnesota nonprofit corpora-

---

1. Traverse Air, one of the parties that participated in the proceedings below, has notified the court that it is not appealing the orders of the district court panel.

2. In response to a previous appeal, this court designated a special panel to hear all the cases demanding judicial review of agency decisions relating to the construction of this high-voltage transmission line. *No Power Line, Inc. v. Minnesota Environmental Quality Council*, Minn., 250 N.W.2d 158 (1976).

3. The legislature has changed the Minnesota Environmental Quality Council to the Minnesota Environmental Quality Board. L.1975, c. 271, § 3(7).

4. Minn.St. 1976, § 116C.57, subd. 1.

5. Minn.St. 1976, § 116C.57, subd. 2.

6. Minn.St. 1976, § 116C.61, subd. 2.

7. Minn.St. 1976, § 116H.13.

8. Minn.St. c. 116D.

tions with a joint membership of over 200 citizens residing primarily in Grant, Douglas, and Pope Counties. Preserve Grant County (PGC) is a noncorporate association with approximately 40 members, most of whom reside in Grant County. Most of the members of these organizations allegedly are landowners who own property in the corridor designated for the proposed HVTL. During the pendency of the administrative hearings, NPL was a member of Counties United for Rural Environment (CURE), which participated through counsel in all the proceedings, but NPL has partially separated itself from CURE for purposes of this appeal. The members of FACT include many current and former members of the other organizations, and, although FACT was incorporated just prior to the consolidation of the appeals to the district court panel, its members allegedly participated in the various public hearings held throughout the affected counties through which the HVTL is routed.

Respondents CPA and UPA are wholesale suppliers of electric power and energy. CPA is composed of 19 rural cooperatives and UPA of 15; together they provide service to approximately 250,000 accounts in Minnesota and to three Wisconsin counties. In 1973, they agreed to construct an electric generating plant and conversion facility [9] in North Dakota, approximately 427 miles (of which about 172 miles will lie in Minnesota) of ± 400 Kilovolt (kv) dc HVTL from the Coal Creek Station in North Dakota to a conversion facility in Wright County, and approximately 28 miles of 345 kv ac double circuit HVTL from there to a CPA/UPA facility in Coon Rapids, Anoka County.

Prior to May 24, 1973, the effective date of the Power Plant Siting Act (PPSA),[10] the location and construction of electrical transmission lines were not regulated on a statewide basis. Instead, a public utility that wished to construct a power line had to secure permits from the local authorities of the counties and municipalities through which it proposed to locate its facilities. In an attempt to ensure that the future development of power generating plants and high-voltage transmission lines in the state would proceed in an orderly and rational fashion [11] and to guarantee wide-ranging, continuous public participation,[12] the legislature passed the PPSA. The legislature included a savings clause which exempted from the operation of the act those—

"* * * high voltage transmission lines, the construction of which will commence prior to July 1, 1974; provided * * * that within 90 days following the date of enactment, the affected utility shall file with the council a written statement identifying such transmission lines, their planned location, and the estimated date for commencement of construction." [13]

CPA and UPA initially availed themselves of the savings clause. On August 22, 1973, they notified MEQC by letter that they planned to construct HVTLs prior to July 1, 1974, and on November 13, 1973, MEQC adopted a resolution that the CPA/UPA transmission line satisfied the requirements of the savings clause. On

---

9. This facility will convert alternating current (ac) into direct current (dc) which will be transmitted over the HVTL to another conversion facility in Delano where it will be converted from dc back to ac.

10. Minn.St. 1976, §§ 116C.51 to 116C.69.

11. Minn.St. 1976, § 116C.55, subd. 1, the statement of policy, reads as follows: "The legislature hereby declares it to be the policy of the state to site large electric power facilities in an orderly manner compatible with environmental preservation and the efficient use of resources. In accordance with this policy, the environmental quality board shall choose sites that minimize adverse human and environmental impact while insuring continuing electric power system reliability and integrity and insuring that electric energy needs are met and fulfilled in an orderly and timely fashion."

12. The legislature mandated public hearings in the development of inventory criteria, Minn.St. 1976, § 116C.55, subd. 2, public hearings in the site or route designation process as well as an annual general public hearing, Minn.St. 1976, § 116C.58, and public participation through advisory committees, and other means to be developed by the MEQC, Minn.St. § 116C.59.

13. Minn.St. 1976, § 116C.67.

June 28, 1974, the utilities sent a letter to MEQC detailing 14 separate acts of construction that had been taken to satisfy the savings clause. Nevertheless, on April 3, 1975, the utilities withdrew this project from the savings clause and submitted it to the jurisdiction of MEQC.[14]

On April 8, 1975, MEQC resolved to accept the CPA/UPA application for a corridor designation and a certificate of corridor compatibility pursuant to Minn.St. 1976, §§ 116C.57 and 116C.61, respectively. CPA/UPA, in its application, proposed two alternative corridors for the HVTL (I and II). On June 10, 1975, MEQC expanded the study area to include two additional corridors (III and IV), and on August 27, 1975, the Power Plant Siting Staff of MEQC recommended a fifth corridor (V). All the proposed corridors fixed the point of entry of the line from North Dakota. MEQC appointed a hearing officer, and 11 public hearings were held between July 21, 1975, and August 27, 1975. On September 12, 1975, the Corridor Evaluation Committee,[15] which had been appointed by MEQC, submitted its final report, and on September 19, 1975, the hearing officer submitted his findings of fact, conclusions, and recommendations.

On October 3, 1975, MEQC adopted the hearing officer's report, designated the corridor recommended by the hearing officer through Traverse, Grant, Douglas, Pope, Stearns, Meeker, Wright, and Hennepin Counties, and issued a "Certificate of Corridor Compatibility."

Appellants appealed to district court for judicial review of this decision on December 3, 1975.[16] After the appeal was dismissed, and further appeal was taken to this court, the case was remanded for trial[17] and later consolidated with other appeals stemming from the approval of the HVTL.

On October 6, 1975, CPA/UPA applied to MEA for a certificate of need pursuant to Minn.St. 1976, § 116H.13.[18] MEA appointed a hearing officer, and 14 days of public hearings were held between December 8, 1975, and January 15, 1976. On March 5, 1976, the hearing officer submitted his report and recommendations, and on April 2, 1976, MEA issued a certificate of need. On May 3, 1976, appellants appealed for judicial review of this decision.

On December 9, 1975, pursuant to § 116C.57, subd. 2, CPA/UPA applied for a construction permit for construction of the HVTL within the approved corridor. Twelve public hearings were held between March 22, 1976, and April 14, 1976, at least one in each of the affected counties. MEQC ordered the Department of Natural Resources (DNR) to prepare an environ-

14. According to the FACT brief, "[q]uestions about routing to minimize disruption of farm operations, tower height and location to minimize negative aesthetic effects, and line diameter to minimize ozone production and thus air pollution and potential health hazards were raised at the county board hearings." At least one county, Pope, denied the CPA/UPA application for a special use permit. Another, Grant County, required the HVTL to be placed underground and to be placed at least 500 feet from residential structures.

15. Although the Corridor Evaluation Committee itself recommended a corridor with a fixed entry point at the North Dakota border in accordance with instructions issued by MEQC, 23 members of the committee speaking individually stated that the MEQC study area was too limited and that more consideration should have been given to potential corridors that would have provided greater possibilities of routing the HVTL through more marginal lands, such as scrub brush, pastureland, hayland, and second-growth forest, rather than requiring the utilization of prime farmlands.

16. On November 12, 1975, CURE had appealed MEQC's decision to the Pope County District Court. The appeal was later consolidated with the NPL appeal remanded for trial by this court.

17. *No Power Line, Inc. v. Minnesota Environmental Quality Council,* Minn., 250 N.W.2d 158 (1976).

18. The certificate-of-need process was intended by the legislature to precede the application for corridor designation. Since the rules governing the certificate-of-need process did not become effective until September 30, 1975, however, the CPA/UPA application did not follow this progression.

mental impact statement (EIS) [19] on the proposed routes. On June 3, 1976, MEQC adopted the hearing officer's recommendation that a construction permit be granted, approved the EIS, and issued a construction permit.[20] On July 13, 1976, appellants appealed for judicial review of this decision.

All of the cases seeking judicial review of these three administrative decisions were consolidated and heard by the special three-judge district court panel. The district court panel decided nine cases challenging in various district courts [21] the certificates and permits issued by these two state agencies. It is from the decision of this panel upholding all agency actions that appellants take this appeal.

The significant issues raised by the appeals are these:

(1) Did MEQC have jurisdiction over the routing of the HVTL to be constructed by CPA/UPA?

(2) Did the administrative proceedings below deal with environmental questions in a manner consistent with legislative intent?

(3) Did the hearing officer and MEQC misconstrue the ambient air quality requirements established by the Pollution Control Agency (PCA)?

(4) Did the incompleteness of the record make the reviewing function of the trial court impossible?

(5) Were appellants denied due process by the failure of the agency to join MAPP [22] as indispensable parties or by its failure to exclude the testimony of Mr. Larry Hartman because of the alleged conflict of interest stemming from his previous employment by a firm associated with CPA/UPA?

(6) Did the legislature delegate its authority unconstitutionally to MEA, an executive agency?

(7) Does this court have inherent authority to grant a stay of the judgment pending the outcome of this appeal without the posting by appellants of a supersedeas bond?

### 1. *Jurisdiction of MEQC*

The threshold issue in this appeal is whether MEQC had jurisdiction over the CPA/UPA application for the designation of a corridor that CPA/UPA filed with MEQC on April 8, 1975. If, as appellants contend, MEQC did not have jurisdiction over the application, then this court would have to vacate the judgment of the district court panel and direct CPA/UPA to begin bargaining with the individual counties and municipalities through which it seeks to construct its HVTL, as it was in the process of doing at the time it voluntarily submitted its project to the jurisdiction of the PPSA.

The statutory basis of appellants' claim that MEQC lacked jurisdiction over the routing of the HVTL is Minn.St. 1976, § 116C.67, the savings clause of the PPSA. Section 116C.67 provides in part:

"The provisions of sections 116C.51 to 116C.69 shall not apply to * * .* high voltage transmission lines, the construction of which will commence prior to July 1, 1974; provided, however, that within 90 days following the date of enactment, the affected utility shall file with the council a written statement identifying

---

**19.** Minn.St. 116D.04.

**20.** On November 30, 1976, MEQC adopted supplemental findings of fact, conclusions, and recommendations in order to correct alleged deficiencies in the transcripts of hearings that had been held on April 13, 1976, and April 14, 1976.

**21.** On March 1, 1977, this court ordered the panel to hear and determine all appeals from the decisions of MEQC and MEA. At that time there were two cases from Grant County, one from Stearns County, one from Meeker County, three from Ramsey County, and one from Traverse County. The panel later decided to add to the consolidated another appeal, filed in Pope County. On May 9, 1977, this court further authorized the panel to hear all motions to stay pending or subsequently commenced actions until the panel finally disposed of the matters stemming from the original consolidation.

**22.** The Mid-Continent Area Power Pool (MAPP) consists of 21 electric utilities, including CPA and UPA, whose systems are interconnected pursuant to a number of power pooling agreements.

such transmission lines, their planned location, and the estimated date for commencement of construction."

CPA/UPA initially availed itself of the savings clause and documented its reasons for being exempted from the PPSA. All the parties agree that when MEQC granted their request on the ground that they had demonstrated that construction had begun prior to the July 1, 1974, deadline, it lost jurisdiction over the siting of the HVTL. The question is whether, once having lost jurisdiction over the project, such jurisdiction could be regained.

The district court panel held that because § 116C.67 was a "grandfather" clause, it furnished the utilities with a special privilege, which they could, and did, relinquish and that the MEQC was acting properly when it accepted jurisdiction over the siting of the HVTL. Because this conclusion is based on legal rather than factual considerations, the reviewing court is not bound by the decision of the agency and need not defer to agency expertise. Minn.St. 15.0425. See, *N. L. R. B. v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839, 849 (1965). Moreover, as this court noted in *Reserve Mining Co. v. Herbst*, Minn., 256 N.W.2d 808, 822 (1977), "We are of the opinion that in reviewing the decisions of administrative agencies this court performs essentially the same function as the district court and is governed by the same scope of review. Accordingly, the usual rule requiring deference to trial court decisions does not apply." Thus, the fact that the district court panel held that MEQC had jurisdiction over the HVTL application is not binding on this court, which can independently review the evidence and come to its own conclusion.

Both respondents MEQC/MEA and CPA/UPA label § 116C.67 as a "grandfather clause." [23] All cases construing grandfather clauses share one thought in common —namely, that it is unfair to penalize the regulated party for something begun prior to the enactment of the statute. Thus, it would be unfair to penalize CPA/UPA for starting construction of the HVTL prior to the enactment of the PPSA, and the savings clause was probably included to preclude such a result.

What makes this case different from all others in which savings clauses have been construed by the courts is that here the party to be regulated is asking for regulation. In all the reported cases, the appellant is fighting to get or retain his exemption; never has a heretofore-exempt party sought to relinquish being excluded from the burdensome regulations enacted by the legislature.[24] For this reason, the existing case law on the subject of grandfather clauses becomes largely irrelevant.

Another way of conceptualizing the issue is in jurisdictional terms. Appellants argue that the legislature specifically limited MEQC's subject-matter jurisdiction to those HVTLs whose construction was to begin after July 1, 1974. Under this theory, once MEQC decided that CPA/UPA had begun construction on the HVTL prior to

**23.** According to *State ex rel. Krausmann v. Streeter*, 226 Minn. 458, 463, 33 N.W.2d 56, 59 (1948): "The purpose of an exception or grandfather clause is to exempt from the statutory regulations imposed for the first time on a trade or profession those members thereof who are then engaged in the newly regulated field on the theory that they who have acceptably followed such profession or trade for a period of years * * * may be presumed to have the qualifications which subsequent entrants to the field must demonstrate by examination." See, also, *United States v. Citizens and Southern Nat. Bank*, 422 U.S. 86, 108, 95 S.Ct. 2099, 2113, 45 L.Ed.2d 41, 59 (1975) (Such a clause was "a simple conferral of legislative amnesty for theretofore unchallenged transactions completed before Congress had clarified the nature of that accommodation."); *Monk & Excelsior v. Minnesota State Bd. of Health*, 302 Minn. 502, 508, 225 N.W.2d 821, 824 (1975) (The legislature, by establishing the period of grace, intended to allow those who had projects in process to proceed to completion without first having to obtain a certificate of need.)

**24.** See, Annotation 4 A.L.R.2d 667 and A.L. R.2d Later Case Service for a discussion of cases interpreting grandfather clauses.

that date, it had no jurisdiction over it.[25] CPA/UPA responds by alleging that the savings clause defines not subject-matter jurisdiction but rather personal jurisdiction of MEQC. Since the subject matter of the PPSA is the siting of electric generating plants and HVTLs in Minnesota, and CPA/UPA plan to construct a HVTL in Minnesota, MEQC has subject-matter jurisdiction over questions surrounding its construction. The distinction is an important one because subject-matter, unlike personal, jurisdiction cannot be conferred by consent of the parties. *Huhn v. Foley Bros. Inc.*, 221 Minn. 279, 286, 22 N.W.2d 3, 8 (1946). Thus, if the court were to decide that the savings clause defined the subject-matter jurisdiction of the PPSA, MEQC was acting ultra vires by accepting CPA/UPA's application of April 8, 1975.[26]

The savings clause can also be viewed in terms of the PPSA's retroactive or prospective application. From this perspective, the question becomes whether the legislature intended to regulate only construction begun after July 1, 1974, or that begun prior to July 1, 1974, as well. Minn.St. 645.21 provides that "[n]o law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature."[27] Appellants contend that by accepting CPA/UPA's application MEQC was applying the statute retroactively. In response, it is argued that as of May 24, 1973, MEQC acquired jurisdiction over all siting decisions. Thus, when it decided to accept jurisdiction on April 8, 1975, it was only applying the statute prospectively.

From the preceding discussion it becomes obvious that the parties are assuming their conclusions by labeling the savings clause as a "grandfather clause" or speaking of "personal" as opposed to "subject matter" jurisdiction or of "retroactive" as opposed to "prospective" application. The question must be resolved, not by applying labels, but by determining what the legislature intended to accomplish with this section of the PPSA.

■ By enacting the PPSA, the legislature sought to ensure that the future siting of power plants and transmission lines would be carried out in an orderly fashion according to a rational design, rather than haphazardly, and possibly unnecessarily, at the whim of individual public utilities whose decisions might fail to consider or comport with the public interest. Minn.St. 1976, §§ 116C.55 to 116C.60. The two crucial concepts that permeate the entire act are that the process should be *orderly* and that there should be *public participation* in all stages of agency decision-making.

■ It seems obvious that the legislature intended the savings clause to protect public utilities whose projects had already begun from being overly burdened by the new statute. Recognizing that such projects of-

---

25. CPA/UPA rightly argues that FACT's interpretation of the savings clause is overly rigid because it would exempt from the control of the PPSA all power lines on which a burst of activity occurred just prior to July 1, 1974, but on which construction was thereafter suspended for a number of years. Such a conclusion does not necessarily follow, however. Since the PPSA requires utilities to file plans with MEQC on a regular basis, MEQC would be able to determine whether construction was continuing. If not, nothing in the act would prevent MEQC from asserting jurisdiction. In this case, however, no evidence ever appears to have been presented to MEQC about the extent to which construction was or was not proceeding, and resolution of this issue does not appear to have been the basis for MEQC's decision to accept jurisdiction over the HVTL application.

26. "Jurisdiction of an administrative agency consists of the powers granted it by statute. Lack of statutory power betokens lack of jurisdiction. It is therefore well settled that a determination of an administrative agency is void and subject to collateral attack where it is made either without statutory power or in excess thereof." *State ex rel. Spurck v. Civil Service Board*, 226 Minn. 253, 259, 32 N.W.2d 583, 586 (1948).

27. In construing § 645.21, this court noted in *Ekstrom v. Harmon*, 256 Minn. 166, 168, 98 N.W.2d 241, 242 (1959): "If the legislature wishes to give retroactive operation to one of its statutes, so as to effect causes of action which arise before its enactment, even as to statutes relating to or governing procedure, it may easily make such an intention clearly manifest." Accord, *Cooper v. Watson*, 290 Minn. 362, 367, 187 N.W.2d 689, 693 (1971).

ten took many years to complete, the legislature did not wish to impose conditions on the utilities for which they had been unable to plan. It is also possible that the legislature thought that such a moratorium would allow the state to develop its guidelines and standards without seeking to utilize the process immediately.

Since the legislature probably did not expect a utility to seek to be regulated if it had an option, whether the legislature intended to permit utilities first to claim exemption from the operation of the PPSA and then later to submit to its procedures is not at all clear. In our effort to ascertain its likely intent, had it considered the question, we have been guided by the twin legislative goals of ensuring the orderliness of the decision-making process and providing the opportunity for public participation therein.

Appellants contend that the administrative process, as it unfolded in this case, was neither orderly nor oriented toward meaningful public participation. Their position is expressed in the FACT brief as follows:

"The Act may be a pragmatic way to site long power lines and large power plants. However, the way in which the PPSA was applied in this case to a very delicate local situation defied the Act's objective to promote local and state cooperation. The inflammatory nature of this case may be due in part to the magnitude of the HVTL, but it may also be due to the fact that the process was yanked from the local level by the power companies which belatedly seized upon new legislation to circumvent the local political process. Because of the history of this case, the reliance of the citizens on the process which existed at the local level, and the intent of the legislature not to force the new legislation on pending projects, remand to the counties to finish their proceedings appears to be the alternative most likely to resolve the existing distrust and ill will."

Respondents argue, in response to appellants' claims, (1) that the restrictions placed on the project by local county boards were not justified either in fact or in law and would have been corrected by available legal process; and (2) that the utilities submitted to the authority of MEQC to protect the project from future attack on the ground that they were improperly evading the restraints imposed upon them by the adoption of the PPSA.

█ It must be acknowledged that, even after reflection, ascertainment of legislative intent is difficult. Although the legislative goals of orderliness and public participation could have been better achieved had the administrative procedures been fully developed prior to MEQC's decision to accept jurisdiction over the routing of this HVTL, centralized decision-making is more orderly than numerous duplicative local actions, and all interested citizens were given an opportunity to be heard in the public hearings conducted at each stage of the process. After long and serious deliberation, we have decided that the legislature would have intended MEQC to have jurisdiction based on our residual conviction that the legislature would have preferred the PPSA to apply to the fullest extent reasonably possible. Therefore, the legislature must have intended to permit the utilities to waive the exception it had carved out in their favor, even though exemption had previously been claimed and granted.

### 2. *The Conduct of the Administrative Hearings*

Since the conduct of the administrative hearings is at the heart of the litigation before us, it is important to understand both the legislative intent in passing these statutes and the ways in which the statutes are interrelated. First, we will present a broad overview of the statutes themselves and a description of the stages through which the legislature intended both the administrative agencies and the applicants for HVTL corridors to pass. Then we will examine both specific instances of alleged noncompliance with the spirit and/or letter of the statutes and, drawing on the case law from this and other jurisdictions, the effect of such noncompliance, if correctly

alleged, on the entire process of administrative decision-making in this controversy.

In the 1973 and 1974 legislative sessions, the Minnesota legislature passed a number of interrelated statutes aimed at protecting the environment in the context of continued economic development. Three of these statutes—Minn.St. c. 116D (MEPA), §§ 116C.51 to 116C.69 (PPSA), and Minn.St. 1976, c. 116H (the Minnesota Energy Agency Act)—play central roles in the controversy over the construction of this HVTL through much of central Minnesota. Thus, it will be helpful to outline briefly what we believe the legislature intended to accomplish when it passed these pieces of environmental legislation.

■ On May 19, 1973, the legislature enacted c. 116D (MEPA). Patterned on NEPA [28] (the National Environmental Protection Act), which was passed by Congress in 1969, MEPA states that it is the state's policy "to use all practicable means and measures * * * in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of the state's people." [29] Minn.St. 116D.02, subd. 1. This policy could be advanced through the procedural mechanism of the EIS. Toward this end, the legislature required that all "major governmental action or * * * major private action of more than local significance" with "potential for significant environmental effects" be preceded by a detailed EIS, § 116D.04. To ensure that administrative decision-making affecting the environment was made with environmental factors in mind, MEPA directed that a draft environmental impact statement be made available to MEQC and the public and that "[t]he final detailed environmental impact statement and the comments received thereon * * * precede final decisions on the proposed action and * * * accompany the proposal through an administrative review process." Minn.St. 116D.04, subd. 4. Since the legislature directed, in § 116D.03, subd. 1, that "to the fullest extent practicable the policies, regulations and public laws of the state shall be interpreted and administered in accordance with the policies set forth in sections 116D.01 to 116D.06 [MEPA]," the other environmental legislation passed later was to be administered in accordance with the policies of MEPA. [30]

Just 4 days after the passage of MEPA, the legislature enacted the PPSA. This act specifically dealt only with power generating plants and HVTLs, but it is clear from its statement of policy that the legislature

---

28. 2 Grad, Treatise on Environmental Law, § 9.07, pp. 9 to 162. In *MPIRG v. Minnesota EQC*, 306 Minn. 370, 237 N.W.2d 375 (1975), the court used federal case law to interpret MEPA. Accord, *Friends of Mammoth v. Board of Super. of Mono Cty.*, 8 Cal.3d 247, 104 Cal. Rptr. 761, 502 P.2d 1049 (1972); *Juanita Bay Valley Com. Assn. v. City of Kirkland,* 9 Wash. App. 59, 510 P.2d 1140 (1973).

29. Among the means of carrying out this policy, state government was ordered to "use all practicable means" to coordinate state programs and resources to "[a]ssure for all people of the state safe, healthful, productive, and aesthetically and culturally pleasing surroundings," § 116D.02, subd. 2(b); to "[d]iscourage ecologically unsound aspects of * * * technological growth, and develop and implement a policy such that growth occurs only in an environmentally acceptable manner," § 116D.02, subd. 2(c); to "[d]evelop and implement land use and environmental policies, plans, and standards * * * through a coordinated program of planning and land use control;" § 116D.02, subd. 2(f); and to "[p]ractice thrift in the use of energy and * * * minimize the environmental impact from energy production and use;" § 116D.02, subd. 2(i).

30. The general rule is that statutes covering the same subject matter should be construed consistently, if that is possible. *Lenz v. Coon Creek Watershed District,* 278 Minn. 1, 11, 153 N.W.2d 209, 217 (1967). "In enacting these several statutes, the Legislature is presumed to have known and had in mind all existing laws relating to the subject-matter, and to have enacted them in the light of such knowledge; and they must be construed so as to harmonize with each other and give full effect to all so far as this may reasonably be done." *Minneapolis Eastern Railway Co. v. City of Minneapolis,* 247 Minn. 413, 418, 77 N.W.2d 425, 428 (1956) (quoting *State v. N. P. R. Co.,* 176 Minn. 501, 507, 233 N.W. 915, 917 [1929]).

intended it to complement MEPA. Section 116C.55, subd. 1, declares that it is the state's policy "to site large electric power facilities in an orderly manner compatible with environmental preservation and the efficient use of resources" and that MEQC "shall choose sites that minimize adverse human and environmental impact." The remaining sections of the PPSA set out the orderly process the state is expected to follow. Basically, the legislature contemplated four stages, each with a specified time limit:

(1) Development of criteria and standards to be used to develop an inventory of potential sites/corridors; time limit: Approximately one year. Minn.St. 1976, § 116C.55, subd. 2.

(2) Development of an inventory of potential sites/corridors; time limit: One year. Minn.St. 1976, § 116C.55, subd. 3.

(3) Choice of specified site/corridor for development of an electrical facility by a public utility; time limit: One year after request for a site, 180 days (6 months) after request for a corridor. Minn.St. 1976, § 116C.57, subd. 1.

(4) Choice of specific route within the designated corridor; time limit: 180 days (6 months). Minn.St. 1976, § 116C.57, subd. 2.[31] The legislature also specifically mandated widespread and continuous public participation in all stages of this process. Minn.St. 1976, §§ 116C.55 to 116C.60.

In the Minnesota Energy Agency Act, the legislature modified to some extent the stages outlined above by requiring a utility to apply for and receive a certificate of need from the MEA before it could apply to MEQC for corridor designation. Minn.St. 116H.13, subd. 2. In keeping with the orderly procedure described above, the legislature intended MEA to develop "[a]n estimate of statewide and geographical area energy need for the forthcoming five and ten year period which * * * will reasonably balance requirements of state and service area growth and development, protection of public health and safety, preservation of environmental quality, and conservation of energy resources. *Such forecasts established by the director shall serve as the basis for certification of large energy facilities in section 116H.13*." Minn.St. § 116H.11, subd. 1(b). (Italics supplied.) The legislature then set a deadline of September 15, 1975, for the promulgation of assessment-of-need criteria for electric transmission lines, § 116H.13, subd. 1, and mandated that after that date no large energy facility would be constructed in Minnesota without the issuance of a certificate of need, § 116H.13, subd. 2.

Thus, by September 15, 1975, the legislature anticipated that the various state agencies charged would have prepared the mandated inventories, standards, and criteria specified in the PPSA[32] and c. 116H. From that time, a utility wishing to build a HVTL would apply first to MEA for a certificate of need and then to MEQC initially for a corridor designation and later for a route designation within the approved corridor.

Appellants object to the manner in which the various decisions were reached on a number of grounds. They contend that the failure to require an EIS at the corridor selection stage, the inversion of the corridor selection and certificate of need hearings, the refusal of the hearing officer to permit additional corridors to be considered, and the inadequacy of the EIS that was eventually prepared are all reversible errors. Appellants therefore request that the entire case be remanded to MEQC and MEA for

---

**31.** In its 1977 revision of the PPSA, the legislature combined these last two steps and gave MEQC one year within which to approve the HVTL route. L.1977, c. 439, § 10. It also deleted the requirement that an inventory of corridors be prepared. L.1977, c. 439, §§ 8, 9.

**32.** Although MEQC was told to develop criteria and standards to be used to prepare an "inventory" of potential generating plant sites and HVTL corridors by July 1, 1974, § 116C.55, subd. 2, and to assemble and publish an inventory of potential sites and corridors before July 1, 1975, § 116C.55, subd. 3, the latter was never accomplished and the requirement of an inventory of corridors was dropped in the 1977 legislative revision of the PPSA. L.1977, c. 439, § 9.

new hearings to be conducted in conformity with legislative intent as outlined above.

■ Although the judiciary has the responsibility of ensuring that administrative agencies comply with legislative mandates, a presumption of administrative regularity exists. As we recently iterated in *Reserve Mining Co. v. Herbst,* Minn., 256 N.W.2d 808, 824 (1977), "decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise * * *." To prevail in this appeal, appellants must demonstrate that the decisions complained of were improperly reached and incorrect, a burden of proof which they have been unable to meet.

Appellants argue that it was reversible error for MEQC not to require an EIS at the corridor-selection stage of the proceedings. Since the designation of a corridor was a "major governmental action" with "potential for significant environmental effects," and since this was the last discretionary stage in the proceedings,[33] the lack of an EIS violated both the spirit and the letter of MEPA.

There are cases from other jurisdictions that appear to support this position. See, *Scientists' Institute for Public Information, Inc. v. Atomic Energy Comm.,* 156 U.S.App. D.C. 395, 481 F.2d 1079 (1973); *Calvert Cliffs' Coordinating Committee v. Atomic Energy Comm.,* 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); *Greene County Planning Bd. v. Federal Power Comm.,* 455 F.2d 412 (2 Cir. 1972); *Save Our Ten Acres v. Kreger,* 472 F.2d 463 (5 Cir. 1973); *Lathan v. Brinegar,* 506 F.2d 677 (9 Cir. 1974); *Davis v. Morton,* 469 F.2d 593 (10 Cir. 1972); *Bozung v. Local Agency Formation Comm. of Ventura Co.,* 13 Cal.3d 263, 118 Cal.Rptr. 249, 529 P.2d 1017 (1975); *No Oil, Inc. v. City of Los Angeles,* 13 Cal.3d 68, 118 Cal. Rptr. 34, 529 P.2d 66 (1974); *Secretary of Environmental Affairs v. Massachusetts Port Auth.,* —— Mass. ——, 323 N.E.2d 329

(1975); *Byers v. Board of Clallam County Commrs.,* 84 Wash.2d 796, 529 P.2d 823 (1974); *Eastlake Community Council v. Roanoke Assoc. Inc.,* 82 Wash.2d 475, 513 P.2d 36 (1973); *Loveless v. Yantis,* 82 Wash.2d 754, 513 P.2d 1023 (1973).

■ We conclude, however, after our independent examination of the agency's record and decision, see, *Reserve Mining Co. v. Herbst, supra,* that while it would have been preferable for MEQC to have required an EIS at the corridor-selection stage of the proceedings, its failure to do so does not constitute reversible error, for the following reasons:

(1) Under the law in effect at the relevant time, MEQC was given discretion to determine when an environmental impact statement was required. Minn.St. 116D.03, subd. 1, provides:

"The legislature authorizes and directs that, *to the fullest extent practicable* the policies, regulations and public laws of the state shall be interpreted and administered in accordance with the policies set forth in sections 116D.01 to 116D.06." (Italics supplied.)

This discretion is found neither in NEPA nor in the statutes of those states whose courts have nullified administrative proceedings when an EIS was absent.

(2) There never has been a specific statutory requirement mandating an EIS at the corridor inventory selection stage of the proceedings; and, indeed, the legislature in its 1977 amendments to the PPSA has eliminated the corridor stage from the HVTL process. L.1977, c. 439, § 10.

(3) An EIS was prepared and was available for the guidance of the agency prior to the selection of the specific route. While we agree that an adequate EIS should be required by the administrative agency at the earliest possible stage, we are not prepared to say that in this case the agency failed to act within the wide discretion granted it by § 116D.03, subd. 1.

---

**33.** Appellants read Minn.St. 1976, § 116C.57, subd. 1, as permitting MEQC to refuse to issue a certificate of corridor compatibility. Once a corridor is chosen, however, MEQC must choose a route within its boundaries. Minn.St. 1976, § 116C.57, subd. 2. Since we reject appellants' argument about the need for an EIS, we do not need to decide this issue.

(4) Whatever reservations we have about the procedure followed, no information has been presented to convince us that the administrative agency did not adequately consider the factors specified in 116C.57, subd. 4. Although not the equivalent of a properly prepared and assembled EIS, substantial compliance with this subsection makes the absence of an EIS less critical than it would otherwise be.[34]

It may very well be that the legislature gave a broader range of discretion to MEQC than it should have and that MEQC could better carry out its legislative mandate if it required the preparation of a draft environmental impact statement earlier in the process than it did. It may also be true that MEQC in the future should be more vigilant in protecting the alleged interests of the public and that it should play more of an active role as an advocate of environmental values. These considerations, however, fall outside the scope of our review and are more properly addressed to the legislature than to the courts.

 Appellants further claim that the failure of the hearing officer in the corridor selection proceedings to consider the question of need for this HVTL was reversible error. Although the statutory scheme established by the legislature obligates a utility proposing to construct a HVTL to apply first to MEA for a certificate of need, § 116H.13, subd. 2, the sequence in which the statutes were adopted meant that CPA/UPA was granted a certificate of cor-

ridor compatibility prior to, but contingent upon, the issuance of the certificate of need. It is argued that this placed MEA in the position of being compelled to issue a certificate of need even though the evidence failed to establish adequately the line's necessity. We believe that this argument is without merit. In our judgment the need for additional electric power was so clear that the order in which the hearings were held was of no practical significance. This belief is confirmed by the fact that during the course of oral argument before this court none of the appellants seriously argued that the electrical energy to be supplied by this project was unnecessary.

 Appellants also attack on a number of grounds the hearing officer's decision that the HVTL's entry point was fixed. They object to the agency's refusal either to consider additional corridors which would permit the HVTL to enter Minnesota at some other point or to allow appellants to introduce evidence on the availability of such other corridors. The hearing officer found that the language of § 116C.57, subd. 1, precluded the suggestion of other corridors by citizen participants, and we believe this determination to be correct. His task was to decide whether the proposed corridor should be approved; generalized references to other corridors would have served no useful purpose. And appellants have not convinced us that a different routing of the power line would do more than merely shift the burdens associated with its presence

**34.** This exact argument was rejected by a federal court in (*E. Natural Resources Defense Council, Inc. v. Grant*, 341 F.Supp. 356, 365, D.N.C.1972), which found that fulfilling the requirements of NEPA in substance was not the same as filing an EIS. The reason for such a position was stated by the court in *Environmental Defense Fund v. Tennessee Valley Auth.*, 339 F.Supp. 806, 810 (E.D.Tenn.1972) as follows:

"The purpose of a section 102(2)(C) detailed environmental impact statement is (1) to aid the agency's decision-making process and (2) to advise the public of the environmental consequences of the proposed action. The requirement seeks to insure that each agency decision-maker has before him, and takes into proper account, all environmental impacts of a partic-

ular project. Only if this is done will the most intelligent, optionally beneficial decision be likely to result. Moreover, the detailed statement provides evidence that these factors have been taken into account. More importantly, it allows those removed from the decision-making process to evaluate and balance the factors on their own. In fact, 'if the decision was reached procedurally without individualized consideration and balancing of environmental factors—*conducted fully* and in good faith—it is the responsibility of the courts to reverse.' (Emphasis added.) *Calvert Cliffs' v. A. E. C.* [146 U.S.App.D.C. 33], 449 F.2d 1109 (1971)."

Because of the differences between NEPA and the Minnesota statutes (MEPA and PPSA), however, these federal cases are not controlling here.

from one group of landowners to another. While adding other corridors to the proceedings would change the identities of the individuals and groups objecting to the placement of the power line on their property, we are not persuaded that it would improve the situation from an environmental point of view.

Finally, appellants challenge the EIS prepared during the route selection proceedings on the following grounds:

(1) That many of the statements made in the EIS are conclusory, rather than factual, in nature.

(2) That it does not include an adequate discussion of alternatives to the HVTL.

(3) That it does little more than incorporate information provided by the applying utilities. .

■■■ The usual statement of the standard of review of the adequacy of an environmental impact statement under NEPA is that it should be determined through the use of "a rule of reason." *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9 Cir. 1974); Accord, *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827 (1972). As the court noted in *Lathan v. Brinegar,* 506 F.2d 677, 693 (9 Cir. 1974),

" * * * The procedures required by NEPA * * * are designed to secure the accomplishment of the vital purpose of NEPA. That result can be achieved only if the prescribed procedures are faithfully followed; grudging, *pro forma* compliance will not do. * * *.

* * * * * *

"This does not mean that the courts are to 'fly speck' environmental impact statements. The preparation of such a statement necessarily calls for judgment, and that judgment is the agency's. But the courts can, and should, require full, fair, bona fide compliance with NEPA."

Although appellants raise serious questions about the conclusory nature of much of the EIS and its failure to discuss alternatives to the HVTL, they have not carried their burden of persuading us that MEQC's actions comprised less than "full, fair, bona fide compliance" with MEPA.

■■■ A number of federal courts have also held that it is an abdication of agency responsibility under NEPA for its EIS to rely solely on information prepared by a project's proponent. *City of Des Plaines v. Metropolitan Sanitary Dist. of Chicago,* 552 F.2d 736 (7 Cir. 1977); *Greene County Planning Bd. v. Federal Power Comm.,* 455 F.2d 412, 420 (2 Cir. 1972); *Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Comm.,* 146 U.S.App. D.C. 33, 43, 449 F.2d 1109, 1119 (1971). The purpose of all environmental legislation, at both the state and the federal levels, is to force agencies to make their own impartial evaluation of environmental considerations before reaching their decisions. The agency's role in the preparation of an EIS is not to serve as an arbiter between two opposing parties, as a judge is expected to do in the adversary process. Instead, it is expected to be a source of independent expertise whose scientific investigation can uncover the data necessary to make an informed environmental decision. This theme was stressed in *Greene County Planning Bd. v. Federal Power Comm., supra* (455 F.2d 420):

"The Federal Power Commission has abdicated a significant part of its responsibility by substituting the statement of PASNY for its own. The Commission appears to be content to collate the comments of other federal agencies, its own staff and the intervenors and once again to act as an umpire. The danger of this procedure, and one obvious shortcoming, is the potential, if not likelihood, that the applicant's statement will be based upon self-serving assumptions."

■■■ We must emphasize, however, that the mere fact that much of the information in the proponent's environmental statement also appears in the agency's EIS is not sufficient, by itself, to demonstrate its inadequacy. While appellants have challenged the completeness and adequacy of the EIS, they have not established that it is untrue, inaccurate, or misleading. After carefully considering appellants' criticisms,

particularly in light of the extensive hearings held during the course of the administrative process, we are not persuaded that the EIS was fatally defective. Thus, we find the challenged EIS to be adequate.

### 3. Ambient Air Quality Standards

Section 116C.61, subd. 3, states that "[n]o site or route shall be designated which violates state agency regulations." Appellants contend that this section precludes the approval of the route because of the existence of the following factors:

(1) The PCA has a regulation prohibiting the presence in the air of more than 0.07 parts per million of ozone for more than one hour per year.

(2) Expert testimony was introduced that a segment of the area was once in violation of the regulation.

(3) HVTLs emit some ozone—estimated to be, in some situations, .005 parts per million.

■ Although the records suggest the possibility, urged by appellants, that MEQC confused the ambient air quality standard, which fixes the maximum permissible ambient air level of an air pollution agent, with "source" pollution standards, which fix the maximum permissible contribution to air pollution from any given pollution source, we do not think that the inaccurate expressions sometimes employed in the hearing transcripts should be taken as proof that MEQC overlooked a distinction so elementary and obvious. Rather, we believe that MEQC concluded that the level of source pollution of ozone that would be caused by the presence of the power line was so minimal, the likelihood that this contribution would increase the ambient air levels above permissible maximums was so remote, and the continuing authority of MEQC to prohibit source emissions was so extensive that denial of the permit on this ground would be unreasonable. We agree.

■ We would like to emphasize, however, that in issuing the construction permit, MEQC was proceeding on the assumption that construction of the HVTL was justified by the evidence before it. To say that the utilities can install a power line is not to say that they are authorized to create conditions that might be damaging either to human or animal life or to vegetation in respects not presently anticipated. Thus, both MEQC and the utilities have an obligation to monitor the line [35] to ensure that if effects are produced that were not anticipated at the time the HVTL was approved, modifications will be introduced to protect the public interest. Moreover, because this HVTL was sought by the utilities, they, and not the public, should have to bear the risk that such modifications might be necessary.

### 4. Claimed Inadequacies of the Record

■ The Minnesota statutes that govern both agency decision making and judicial review thereof require that a complete record of all hearings be maintained and utilized at both levels. Thus, Minn.St. 116C.06, subd. 2 states that "[t]he transcript of testimony and exhibits shall constitute the exclusive record upon which [the hearing officer's] findings of fact are made," and § 116C.60 requires a complete record of public hearings to be kept. Similarly, Minnesota's Administrative Procedures Act requires an official record to be maintained, § 15.0418, which the agency transmits to the reviewing court, § 15.0424, subd. 4, whose review is confined to the record, § 15.0424, subd. 6.

■ Appellants contend that the failure of MEQC to certify a complete record of two of the local hearings make judicial review of the MEQC decision impossible. Respondents assert that the record was corrected by the addition to the official rec-

---

**35.** Paragraph 2.7 of the Construction Permit issued by MEQC requires the utilities to monitor the effect of ozone and oxides generated by the line on adjacent vegetation. It does not, however, provide for other forms of monitoring or for monitoring by MEQC. Expanded monitoring could be ordered under the authority of Paragraph 1.14 which provides that the permit is subject to modification or even revocation.

ord [36] of the tape recordings of one of the appellants. The three-judge district court panel held that "[t]here is now before the court * * * what is, in substance, 'a complete record,'" that appellants had not sought to bring additional evidence forward, and that "[a]ppellants have not shown any prejudice by the condition of the record as finally returned for review."

In our judgment, the decision of the three-judge panel with respect to the "incomplete transcript" issue is clearly correct.

### 5. *Alleged Due-Process Violations*

■ Appellants contend that the failure to join the other members of the multi-utility pooling agreement (MAPP) in the corridor- and route-designation hearings and the improper influence exerted by Larry Hartman, a former employee of Commonwealth Associates which was employed by CPA/UPA to choose its corridor, denied them due process. There is no validity to these contentions.

Under the Minnesota Rules of Civil Procedure, for a party to be an indispensable party he must satisfy certain requirements. Rule 19.01 reads in part as follows:

"A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."

Appellants, however, have demonstrated no way in which the corridor or route selection would be affected by the joinder of these parties. They claim, for example, that "[t]he prejudice to appellant in this regard is the fact that it might pay for its share of the power line and wind up being denied the use of it; and of having its rates based on all of the deferred construction costs of all of the involved utilities alone," without linking this prejudice to the decisions that were made at the corridor- and route-selection hearings. Thus, since the MAPP members were never shown to be indispensable to these proceedings, the decision of the hearing officer not to require them to answer interrogatories was correct.

The claim of bias against Larry Hartman is equally without merit. All the cases cited by appellants proscribe bias by the decision maker and not by a witness. *Cinderella Career and Finishing Schools, Inc. v. Federal Trade Comm.*, 138 U.S.App.D.C. 152, 425 F.2d 583 (1970) (decision maker); *Texaco, Inc. v. Federal Trade Comm.*, 118 U.S.App.D.C. 366, 336 F.2d 754 (1964) (decision maker); *Amos Treat & Co., Inc. v. Securities Exchange Comm.*, 113 U.S.App.D.C. 100, 306 F.2d 260 (1962) (staff of decision-making agency). As the trial court correctly noted,

"* * * Mr. Hartman was not a decision maker in the final determination of these matters and his participation as a member of the Power Plant Siting Staff and his testimony before the hearing officer did not violate constitutional due process. * * *.

* * * * * *

"The hearing officer * * * was in a position to observe the activities and demeanor of Mr. Hartman and specifically found * * * that Mr. Hartman was not prejudiced or biased. * * * [Moreover, t]he issue of potential bias or prejudice of a particular witness runs to the weight to be given to the testimony of such witness by the hearing officer, and is not a ground for reversal of the decision of the ultimate decision maker * * *."

---

**36.** On August 4, 1976, MEQC ordered the Fuchs tapes transcribed and reviewed by the hearing examiner and MEQC. The hearing examiner, after listening to the Fuchs tapes, reaffirmed his original findings; MEQC did likewise and then transmitted to the three-judge panel a supplemental record which included the transcription of the Fuchs tapes.

### 6. *Unconstitutional Delegation of Power*

The appellants appear to be arguing that because the state has never been able to find out exactly how much the HVTL will cost and because the price paid by the rural users of electricity will be partially determined by the costs of constructing the HVTL, the legislature and MEA have given the utilities a blank check to gouge the consumers of electricity. They claim:

" * * * [U]nless a statute, or the rules promulgated under it, or the safeguarded (sic) afforded by the procedures employed during the hearings based on the statute and rules, provide a means or method by which the burden of the costs can be balanced against the benefits to be received by the consumers, who 'foot the bill', the ultimate consumers are denied due process of law.

 * * * * * *

"[Thus,] any statute, or the rules promulgated under any statute, or the administration of any statute or rule, which denies public expression or inquiry on the point of the cost of a proposed activity of a regulated industry, especially one which will drastically affect the public pocketbook, is an unlawful delegation of legislative powers, and hence contrary to the provisions of Article III of the Minnesota Constitution."

As this court stated in *Lee v. Delmont,* 228 Minn. 101, 113, 36 N.W.2d 530, 538 (1949), and affirmed in *Remington Arms Co. Inc. v. G. E. M.,* 257 Minn. 562, 570, 102 N.W.2d 528, 534 (1960):

" * * * Pure legislative power, which can never be delegated, is the authority to make a complete law—complete as to the time it shall take effect and as to whom it shall apply—and to determine the expediency of its enactment. Although discretion to determine when and upon whom a law shall take effect may not be delegated, the legislature may confer upon a board or commission a discretionary power to ascertain, under and pursuant to the law, some fact or circumstance upon which the law by its own terms makes, or intends to make, its own action depend. The power to ascertain facts, which automatically brings a law into operation by virtue of its own terms, is not the power to pass, modify, or annul a law. If the law furnishes a reasonably clear policy or standard of action which controls and guides the administrative officers in ascertaining the operative facts to which the law applies, so that the law takes effect upon these facts by virtue of its own terms, and not according to the whim or caprice of the administrative officers, the discretionary power delegated to the board or commission is not legislative."

There appears to be no meaningful difference between the power of the legislature delegated to MEQC in the PPSA and the power it delegated to MEA in Minn.St. c. 116H. Section 116C.57, subd. 4, and § 116H.13, subd. 3 provide guidelines to MEQC and MEA respectively about the factors to consider in coming to their decisions, and both have been expanded into regulations by the respective agencies.[37] Yet the PPSA is not challenged on this ground.

We are not persuaded that the failure of the legislature to require a specific finding of probable cost of a proposed project renders the delegation of authority unconstitutional. The evidence concerning probable cost that was received was certainly relevant, and requiring such a finding in many situations would be most useful. We do not believe, however, that the determination of cost is so essential that its absence nullifies the proceedings on constitutional grounds.

### 7. *Stay of Proceedings*

We are satisfied that the Minnesota Supreme Court has inherent power to order a stay of proceedings pending before it without the necessity of a supersedeas bond. This authority, however, should be exercised sparingly and only when we are satisfied that the unique circumstances of a particular case makes it in the public inter-

---

**37.** Minn.Reg. MEQC 74; Minn.Reg. EA 601 to 638.

est to order such a stay. We have tested the instant case by this standard and have concluded that our decision to stay proceedings pending the filing of this decision without the requirement of a supersedeas bond was in conformity with law. Upon remand of this case to the district court, the stay heretofore directed terminates.

### 8. *Conclusion*

 Although we are not persuaded that the procedures followed by MEQC and MEA failed to meet the requirements of the law and we affirm the unanimous decision of the three-judge panel, we are acutely aware of the problems that will be faced by the landowners who have to bear the burden of the power line. It is evident that the presence of the HVTL on their property will create significant damage to their livelihoods and their investments. We are justified in assuming that since the issue of compensation will be tried in the county in which the land is located, Minn.St. 117.055, the landowners affected will be treated fairly and reasonably. Because the taking here involved is an intrusion which they have not requested and to which they have not consented, the damage awards should be subjected to close judicial scrutiny to assure compliance with Minn.Const. art. 13, § 4, which provides that in cases such as this "a fair and equitable compensation shall be paid for such land and for the damages arising from taking it."

Affirmed.

YETKA, Justice (concurring specially).

I concur with the majority, but only because I can see no purpose in remand except a delay in construction and higher costs as a result thereof. It is obvious to me that under the existing statutes the state agencies will do no more than conduct hearings and approve the certificate of need and the route already selected.

However, in my opinion, what is wrong with this case is that the state agencies involved have misconstrued their intended role in proceedings of this type. They have played a passive rather than an active role.

I perceive the latter being the proper function under the statutory scheme of things.

All of the new laws dealing with the protection of the environment included within Minn.St. c. 116A through 116H, passed in recent years, fundamentally changed the law in this state. Prior to the passage of these laws, holders of eminent domain rights could simply decide to construct new generating and transmission facilities, decide on a route, and go ahead and acquire the rights of way.

With the passage of the environmental policy contained in c. 116, however, the legislature clearly intended to place conditions and limitations on further destruction of the environment. The legislature decided, with the wisdom which must guide the courts, that before generating and transmission facilities could be constructed the need for those facilities and the impact on the environment must be determined.

Prior to the passage of Minn.St. c. 116C, the utilities involved in these proceedings had already decided to participate in the construction of generating facilities in North Dakota and to transmit that power into Minnesota to a predetermined location near Coon Rapids. There was a savings clause in the statute which exempted certain work already commenced. After first applying for the exemption and having it granted, the utilities then elected to drop their claim and voluntarily come under the purview of the new act. At oral argument it was admitted part of the reason was to simplify the procedure in acquiring the entire right of way. The net result is that the utilities used the previous law to foreclose the necessity of establishing need, but applied the new law to acquire the right of way. True, separate proceedings on the question of the need for the facilities were conducted, but they were hastily organized and possible alternative sources of power do not appear to have been seriously considered.

It is apparent from the transcripts of the public hearings held throughout the state in connection with the location of the route

that the finding of need was a foregone conclusion, as was the location of the generating system in North Dakota, where the transmission line from North Dakota would enter into the state of Minnesota, and finally where the terminating point would be near Coon Rapids.

This raises a very serious question: What should be the proper role of the state agencies empowered to act under this statute? To limit itself to consideration of proposals made by the utilities and any possible counter proposals that might come from the public? Or is it to serve as an independent, impartial arm of all of the citizens of this state to not only take and hear evidence but if necessary to generate evidence of its own.

I cannot envision a governmental agency being effective in protecting the public without having the authority to itself seek out the facts independently. The legislature should address itself to clarifying and strengthening the role of the agencies in this type of proceeding if the intent of the environmental statutes is to be carried out.

I believe it was incumbent upon the agencies to conduct in-depth studies of the environmental impact of the construction of this transmission facility prior to the selection of any *corridor* or *route.* Although the agency, under the act as originally passed, was required to set up an inventory of possible corridor routes for transmission lines, it had not done so by the time the application brought by these companies was filed. Accordingly, the board, conducting hearings on selection of a corridor, went ahead before there was even a decision on the need for the facilities. Many members of the public who objected to the facilities being constructed at all were confused by the reversal of the natural order in the decision-making process.

I can fully appreciate the fact that the utilities have an obligation to serve their customers and shareholders, and they conceive their duty is to do it in the most feasible way possible. They made a decision before the act was even passed to construct facilities and transmit power. But when they elected to come under the purview of the act, that act should have been fully implemented. The state agencies should have delved into all alternative sources available, such as solar energy, transmission of fuel for a series of smaller facilities, hydroelectric power, etc. Where is this extra power to go? To existing customers or to new contemplated customers, commercial and industrial, as well as farm and rural households? Could these new users supply their own electrical needs?

Although these were questions that should have been gone into prior to the determination that there was even a need for these facilities, it would appear that all the parties to this action, including the state agencies, assumed that there was a need for these facilities, the subject of this action, and therefore the question has not been litigated and is not before us.

However, the environmental impact statement which was required prior to the selection of route should have been filed in this case prior to the selection of a corridor. Here the alternatives for a route were greatly narrowed when the state agency allowed the utilities to select the entry point from North Dakota and the terminal point for the transmission of the power. It is entirely possible that if these two points had not been decided upon early in the game, new corridors could have been selected far from the point of actual selection.

The actual environmental impact statement that was filed leaves much to be desired. It appears to have been constructed in great haste and with little study or input on behalf of the citizens of this state on the part of its state agencies.

In the briefs and at oral argument, the *Reserve Mining* case[1] has been cited. I think it has no bearing whatever on these proceedings. In the *Reserve* case the objective was to get a large existing industrial user to cease using Lake Superior as a dumping ground for tailings and to get them to use an on-land disposal site. There

---

1. *Reserve Mining Company v. Herbst,* Minn., 256 N.W.2d 808 (1977).

was no new construction involved, except in the tailings basin and that site had to be restored to a useful and attractive condition after being abandoned.

A case more in point is *County of Freeborn by Tuveson v. Bryson,* Minn., 243 N.W.2d 316, 321 (1976), where we said:

"* * * Indeed, as a political subdivision of the state, the county has a greater duty than does a private individual to see that legislative policy is carried out. * * *

* * * * * *

"Times change. Until the Act was passed, the holder of the power of eminent domain had in its hands almost a legislative fiat to construct a highway wherever it wished. In the 1920's and 1930's, the state encouraged highway construction to facilitate industrial expansion and transportation of farm products to market. However, a consequence of such construction has been the elimination or impairment of natural resources."

The state agencies came no where close to studying the environmental impact in this case as they did in the *Reserve Mining* case. If they had, perhaps a proper solution could have been found that would not have crossed forests and farmlands, but could have more fully utilized existing roads of commerce, such as highways and railroads.

It is noteworthy that after this action was brought the 1977 legislature amended the act to provide that in addition to the previous matters that must be taken into consideration in designating sites and routes, it added three new requirements. They are (L.1977, c. 439, § 10, amending Minn.St. 1976, § 116C.57, subd. 4):

"(8) Evaluation of potential routes which would use or parallel existing railroad and highway rights-of-way;

"(9) Evaluation of governmental survey lines and other natural division lines of agricultural land so as to minimize interference with agricultural operations;

"(10) Evaluation of the future needs for additional high voltage transmission lines in the same general area as any

proposed route, and the advisability of ordering the construction of structures capable of expansion in transmission capacity through multiple circuiting or design modifications;"

One point is obvious to me: We cannot stand much more highway and above-ground power line construction without permanently destroying and impairing our environment. The question is where do we stop?

I would hope that this case would make it apparent to the legislature that the statute, as written, is not preventing the continued warping away of our treasured rural environment; that the state agencies must be given a clear mandate to stop the destruction of farm and forest lands; that existing roadways and railroad rights of way must be used wherever possible, even though the resultant cost may be higher in dollars than some other possible route. Because over the long run spending additional money in laying down these new power line routes initially may be cheaper by reason of the fact that there would be continued productive use of these farm and forest lands in perpetuity that otherwise would be taken out of production. Moreover, it seems to me that by requiring these facilities to be located along public highways where everyone can see them, the public itself may be more concerned with limiting their use. When asked at oral argument, counsel for the state admitted that these utilities' transmission lines are not being constructed along highways, first of all because of a Federal program of preventing their use on interstate highways, and, second, because of the objection of the state highway department to their being "unsightly." The more the public generally is exposed to what is being done to our environment, the better they will be able to participate in the decision-making process of determining whether or not they wish to pay the cost—both in dollars and in destruction to the environment—involved in a project such as this.

PETERSON, J., took no part in the consideration or decision of this case.