**CITY OF ROCHESTER, Appellant,**

v.

**PEOPLE'S COOPERATIVE POWER ASSOCIATION INC., etc., et al., Minnesota Public Utilities Commission, Intervenor, and Minnesota Department of Public Service, Intervenor, Respondents.**

Nos. C2–90–2141, C5–90–2148 and C5–90–2151.

Court of Appeals of Minnesota.

March 5, 1991.

Review Granted April 29, 1991.

Review Dismissed May 28, 1991.

Joseph F. Chase, O'Brien, Ehrick, Wolf, Deaner & Maus, Rochester, for City of Rochester.

Kenneth R. Moen, Dunlap, Finseth, Berndt & Sandberg, Rochester, for People's Co-op Power Ass'n Inc., etc., et al., Hubert H. Humphrey, III, Atty. Gen., Margaret E. Hendriksen, Asst. Atty. Gen., St. Paul, for Minnesota Public Utilities Com'n.

Eric F. Swanson, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Dept. of Public Service.

Considered and decided by WOZNIAK, C.J., and RANDALL and CRIPPEN, JJ.

## OPINION

RANDALL, Judge.

The City of Rochester (City) appeals from an order dismissing its petitions to condemn portions of respondent's, People's Cooperative Power Association Inc. (Peoples), utility property. The trial court held it had jurisdiction to decide the controversy, but it declined to do so pursuant to the doctrine of primary jurisdiction. We affirm.

### FACTS

The facts in this matter are undisputed. The City annexed a number of subdivisions within a service territory previously assigned by respondent, Public Utilities Commission (PUC), to Peoples. The City sought to extend utility service to the subdivisions through "quick take" eminent domain proceedings.

The trial court determined that it had jurisdiction to decide the eminent domain

question, but refused to decide the matter, deferring to the primary jurisdiction of the PUC.

The City filed appeals and petitions for mandamus. We denied mandamus and consolidated the City's appeals. We also granted the City's motion to accelerate the appeal and date of opinion release.

## ISSUES

1. Did the trial court err by determining a city may elect to acquire utility property by eminent domain rather than by administrative proceedings before the PUC?

2. Could the trial court properly invoke the doctrine of primary jurisdiction and dismiss the City's eminent domain petitions?

## ANALYSIS

### I.

*Eminent domain*

■ The City argues the legislature has authorized it to obtain Peoples' utility property by eminent domain. As authority for its argument, the City cites Minn.Stat. § 216B.47 (1988):

Nothing in [Chapter 216B] shall be construed to preclude a municipality from acquiring the property of a public utility [including a cooperative electric association] by eminent domain proceedings; provided that damages to be paid in eminent domain proceedings shall include the original cost of the property less depreciation, loss of revenue to the utility, expenses resulting from integration of facilities, and other appropriate factors. * * *

According to the City, this language is unambiguous, and allows it to condemn Peoples' utility property. Where statutory language is unambiguous, we may not disregard the letter of the law under the pretext of pursuing its spirit. *Kearns v. Julette Originals Dress Co.*, 267 Minn. 278, 282, 126 N.W.2d 266, 268–69 (1964).

■ According to the parties, the PUC has historically interpreted the language of Minn.Stat. § 216B.47 at face value, and has suggested a city may proceed by eminent

domain to condemn another utility's property. Only recently has the PUC apparently changed its interpretation of this statute. While we generally accord substantial consideration to an agency's interpretation of its own statutes, particular deference will be given to long standing administrative interpretations. *See Mankato Citizens Tel. Co. v. Comm'r of Taxation*, 275 Minn. 107, 145 N.W.2d 313 (1966). However, the interpretation of a statute is ultimately a question of law. *See N. Power Line, Inc. v. Minnesota Environmental Quality Council*, 262 N.W.2d 312, 320 (Minn.1977).

■ Respondents argue Minn.Stat. § 216B.47 only applies to municipalities which do not already own and operate utilities. According to respondents, this provision must be construed within the entire context of Chapter 216B. Where it is necessary to resort to construction of a statute, various provisions of the statute must be interpreted in light of one another, and the legislature must be presumed to have intended the entire statute to be read as a whole. *See Kollodge v. F. and L. Appliances*, 248 Minn. 357, 80 N.W.2d 62 (1957). Accordingly, a brief summary of the relevant provisions of Chapter 216B follows.

Minn.Stat. §§ 216B.37–.47 (1988) provides for the assignment of areas to and between electric utilities. The establishment of assigned service areas was intended to encourage coordination of state-wide electric service, eliminate or avoid unnecessary duplication of electric utility facilities, and promote economical, efficient, and adequate electric service to the public. Minn. Stat. § 216B.37 (1988).

Generally, a utility has exclusive right to provide electric service to customers within its assigned service area. Minn.Stat. § 216B.40 (1988). Where a municipality elects to annex a part of an assigned area of another utility, as in this case, such annexation

shall not in any respect impair or affect the rights of the electric utility to continue and extend electric service at retail throughout any part of its assigned service area unless a municipality which owns and operates an electric utility

elects to purchase the facilities and property of the electric utility as provided in section 216B.44.

Minn.Stat. § 216B.41 (1988).

Minn.Stat. § 216B.44 provides whenever a municipality "which owns and operates an electric utility" annexes territory or extends service within its corporate boundaries, the municipality

shall thereafter furnish electric service to those areas unless the area is already receiving electric service from an electric utility, in which event, the municipality may purchase the facilities of the electric utility serving the area.

Where the municipality elects to purchase the facilities of the other utility, the parties must decide appropriate compensation to be paid for the utility property. If the parties cannot arrive at a decision regarding compensation, the PUC may determine appropriate terms of sale. In making such determination, the following factors must be considered:

the original cost of the property, less depreciation, loss of revenue to the utility formerly serving the area, expenses resulting from integration of facilities, and other appropriate factors.

Minn.Stat. § 216B.44. These factors are the same as those in section 216B.47, which authorizes a city to utilize eminent domain proceedings.

Minn.Stat. §§ 216B.45 and 216B.46 provide for purchase by a municipality of another utility's property where that utility is already operating within the municipality. Although the language in these sections refers to purchase by a "municipality", in 1983 the legislature explained the term "municipality" in these sections is limited to a municipality which, prior to the time of purchase, did not already operate a utility. See Minn.Stat. § 216B.465.

Respondents argue the entire context of these sections indicates that when the legislature referred to a "municipality" in section 216B.47, by implication the legislature intended the term "municipality" should be limited to a municipality which does not already own and operate an electric utility. As authority for this argument, respon-

dents point to section 216B.41 and section 216B.44, which refer specifically to a "municipality which owns and operates an electric utility." Accordingly, respondents conclude that where the legislature does not use the language, "which owns and operates an electric utility," the legislature must have meant a municipality which does not already own and operate an electric utility. Respondents buttress this argument by pointing to section 216B.465, which clarified that the provisions of sections 216B.45 and 216B.46, although referring only to "municipality", were intended to apply to municipalities which do not operate a municipality utility.

We disagree. If the legislature wishes to include strict limiting language to the term "municipality" in section 216B.47, it could do so, since it added limiting language in other sections of Chapter 216B.

Respondents also point to section 216B.41, which provides that a municipality which annexes territory within another utility's assigned service area cannot impair the rights of the existing utility unless the municipality elects to purchase the facilities and property of the utility as provided in section 216B.44. However, we note section 216B.44 provides only that the municipality "may" purchase the facilities of the electric utility. More importantly, section 216B.47 indicates nothing in the other provisions of Chapter 216B can be construed to preclude a municipality from proceeding by eminent domain. This provision supersedes prior limiting language within the statute.

■ In *City of Shakopee v. Minnesota Valley Elec. Coop.*, 303 N.W.2d 58 (Minn. 1981), a city petitioned to condemn utility property belonging to an electric co-op. After a hearing, the trial court approved the condemnation. On appeal, the supreme court determined the city had the power to condemn the utility property, because it had the authority to purchase that property pursuant to Minn.Stat. § 216B.45. The court cited Minn.Stat. § 465.01 (1980), which provided that a city has a general power to condemn "for any purpose which

it is authorized by law to take or hold the same by purchase * * *." The court noted that under section 216B.45, the city had the authority to purchase the property of a public utility operating within the municipality. The court concluded:

Since Shakopee may purchase the cooperative's property, it may condemn it.

*Id.* at 60. The court also noted the city was not required to conduct a referendum or a public hearing, which was a precondition to purchasing a utility under sections 216B.45 and 216B.46:

[I]t is enough for eminent domain that a purchase is authorized by law if certain procedures are followed without having to follow those procedures. Thus, the next section in chapter 216B commands, "Nothing in [chapter 216B] shall be construed to preclude a municipality from acquiring the property of a public utility by eminent domain proceedings * * *."

*Id.* at 61–62.

In addition to determining as a matter of law the city had the right to condemn the cooperative's property, the *Shakopee* court suggested policy reasons supported the use of eminent domain:

If * * * the purpose of such acquisition is to transfer the ownership and operation of such property from a public service corporation (which, although a quasi-public entity, is nevertheless a private corporation organized for profit) to a municipality or other purely public corporation, it has been held that the greater public use and increased public benefit which results from governmental operation justifies such acquisition.

\*  \*  \*  \*  \*  \*

Operating a utility is a proper government function, both for deriving income and for providing service. If Shakopee chooses to supply electricity to city customers in the cooperative's service area, then acquiring the cooperative's lines, poles and other distribution equipment is a reasonable and convenient alternative to constructing the same facilities anew.

*Id.* at 60, 62.

We recognize the parties in *Shakopee* did not raise the argument that eminent do-

main was improper because the entire purpose of chapter 216B was to vest jurisdiction in the PUC. Nevertheless, *Shakopee* is persuasive as it specifically concludes a city may proceed by eminent domain to acquire utility property.

Respondents argue that in 1983 the legislature overruled the *Shakopee* decision, by providing in section 216B.465 that sections 216B.45 and 216B.46 are limited to municipalities which do not already operate a utility. Notably, in *Shakopee*, the city already operated a utility. Section 216B.465 now provides a municipality already operating a utility must proceed pursuant to the provisions of 216B.44, instead of 216B.45 and 216B.46. Nevertheless, the *Shakopee* analysis is applicable. As the *Shakopee* opinion states, a municipality which has the authority to purchase may proceed by eminent domain. We find section 216B.44 gives a municipality already operating a utility the authority to purchase another utility after annexation. Here, the City has the authority under section 216B.44 to purchase Peoples' utility property. Therefore, under *Shakopee*, the City is also authorized to proceed by eminent domain.

We note if the legislature had intended to limit a municipality's eminent domain powers after *Shakopee*, it could have done so when it amended section 216B.465. The legislature did not state that only a municipality which does not already own a utility may proceed by eminent domain. Rather, the legislature left section 216B.47 intact, allowing "a municipality" to proceed by eminent domain.

Respondents argue there are several policy reasons for limiting the section 216B.47 eminent domain authority to municipalities who do not already operate utilities. Respondents point out the City's utility is regulated by the PUC, which has jurisdiction over all utilities and their assigned areas. Minn.Stat. §§ 216B.36; 216B.39. Respondents allege this present dispute is between two utilities, rather than between a municipality and a utility. According to respondents, the same concerns are not present when a municipality which does not

own a utility seeks to condemn utility property, and in that setting respondents argue the PUC's jurisdiction is not circumvented.

We are not pursuaded. Whether or not a municipality owns a utility, its use of eminent domain to obtain utility property which it did not previously own must, in some way, encroach upon the PUC's jurisdiction to determine who is entitled to serve an area.

Respondents also argue section 216B.47 conflicts with Minn.Stat. § 216B.66, which provides that chapter 216B is "complete in itself," and other statutes which conflict with chapter 216B "are repealed insofar as they pertain to the regulation of public utilities as defined herein." We do not agree a provision within chapter 216B can conflict with chapter 216B, as respondents argue. Section 216B.47 is clear that notwithstanding anything else in chapter 216B, a municipality may still acquire utility property by eminent domain proceedings.

## II.

### Primary jurisdiction

Although the trial court determined it had jurisdiction over the city's eminent domain proceeding, the court nevertheless declined to decide this matter by invoking the doctrine of primary jurisdiction. One commentator has described this doctrine:

The doctrine of primary jurisdiction * * * applies when an agency and a court have concurrent jurisdiction. If the issue is one that "has been placed within the special competence of an administrative body", the court may defer to the agency for an initial decision.

The purpose of the rule is to ensure uniformity of interpretation of laws administered by agencies and to take full advantage of an agency's expertise. Its application is not automatic, however. The court may decline to defer to the agency if the agency's determination would not necessarily aid the court or if the question to be decided by the court differs from that which would be decided by the agency.

Beck, *Minnesota Administrative Procedure*, Section 13.2.3 (1987).

The Minnesota Supreme Court has suggested the doctrine of primary jurisdiction exists where a statute provides a plaintiff with alternative methods of pursuing a claim. *See Brevik v. Kite Painting, Inc.*, 416 N.W.2d 714, 719 (Minn.1987).

Despite authority indicating the doctrine of primary jurisdiction is applicable where a court and administrative body exercise concurrent jurisdiction over a controversy, the City argues the question involves statutory intent, and only where the legislature has not expressly spoken on the jurisdiction issue may the court apply the doctrine.

However, we note Professor Davis' treatise on administrative law:

Not only is the doctrine judge-made but the original case creating the doctrine overrode explicit and unequivocal statutory provisions allowing the court to act initially. The principal criterion in deciding whether the doctrine is applicable usually is not legislative intent but usually is judicial appraisal of need or lack of need for resort to administrative judgment.

3 K. Davis *Administrative Law Treatise*, section 19.06 (1972) (citing *Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907)).

The City cites *State ex rel. Pollution Control Agency v. United States Steel*, 307 Minn. 374, 240 N.W.2d 316 (1976) in support of its argument that primary jurisdiction is a question of statutory intent. In *U.S. Steel*, however, an agency was suing, pursuant to statutory authority, to enforce its permitting authority. The relevant statute allowed the agency to enforce its authority by several types of judicial actions. The *U.S. Steel* court noted the doctrine of primary jurisdiction was inapplicable, and that the agency need not first issue an order directing the alleged violator to cease violating the agency's authority. *U.S. Steel* is distinguishable from the present case, since there an agency's remedy consisted of several types of lawsuits in court, and the statute did not alternatively provide for administrative action.

■ We find respondents' arguments in favor of applying the primary jurisdiction doctrine compelling. The PUC has a demonstrated expertise in the area of public utilities, and is more aware of potential damage to be incurred. *See City of Willmar Mun. Utilities Comm'n v. Kandiyohi Coop. Elec. Power Ass'n.*, 452 N.W.2d 699, 703 (Minn.App.1990), *pet. for rev. denied* (Minn. Apr. 27, 1990). The trial court properly found that eminent domain commissioners lack the same experience as the PUC in determining damages, especially future potential damages. The trial court did not abuse its discretion in declining to accept jurisdiction.

## DECISION

The trial court properly recognized it had jurisdiction over the parties' controversy. However, the court did not err by invoking the doctrine of primary jurisdiction.

Affirmed.