MONK AND EXCELSIOR, INC., AND OTHERS v.
MINNESOTA STATE BOARD OF
HEALTH AND OTHERS.

225 N. W. 2d 821.

January 17, 1975—No. 44732.

*Broeker, Bachman & Zerby, John M. Broeker,* and *Steven R. Hedges,* for appellants.

*Warren Spannaus,* Attorney General, *Jonathan H. Morgan,* Solicitor General, *Peter W. Sipkins,* Assistant Solicitor General, and *Richard A. Wexler,* Special Assistant Attorney General, for respondents.

Heard before Rogosheske, Kelly, and Yetka, JJ., and considered and decided by the court en banc.

YETKA, JUSTICE.

Plaintiffs brought an action for declaratory judgment under Minn. St. c. 555, to determine whether a nursing home they proposed to build in Hopkins, Minnesota, came within the purview of the Minnesota Certificate of Need Act, Minn. St. 145.71 to 145.83, L. 1971, c. 628. They appeal from a judgment holding they must obtain a certificate of need under the act. We reverse.

Plaintiff Monk and Excelsior, Inc., is a corporation organized and existing under the laws of the State of Minnesota. Plaintiffs Martin J. Hellman and Rudy Luther are individuals residing in the state.

The Minnesota State Board of Health is empowered and authorized by Minn. St. 144.50 to 144.56, to license nursing homes in the state and to issue certificates of need under Minn. St. 145.71 to 145.83 for the construction of nursing homes.

In 1971, the legislature enacted the Minnesota Certificate of Need Act. This act establishes the issuance of a certificate of need as a prerequisite to the lawful construction of any health care facility, including nursing homes, in the state. These certificates are to be issued or denied on the basis of whether or not the proposed facilities are necessary as set out in an areawide comprehensive health plan. The ultimate authority to grant or deny said certificates is vested in the State Board of Health, although this body is to consider the recommendations of the areawide comprehensive health planning agency in reaching a decision.

In 1970 plaintiffs Hellman and Luther embarked on a project to construct a nursing home on the corner of Monk and Excelsior Avenues in Hopkins, Minnesota. In furtherance of this idea, they hired an architect, Juris Cūriskis, to draw up plans for this proposed development.

In September 1970, Hellman contacted defendant State Board of Health to initiate review of the plans for the Hopkins project.[1] At that time, defendant Dr. Helen Knudsen, director of the Division of Hospital Services, advised Mr. Hellman that the board would not review his plans for additional beds at Hopkins because he would have to first maintain the nursing home in Richfield, Minnesota, which he owned and operated, called the Richview Nursing Home, at a satisfactory level for at least 6 months, and, further, that the proposed facility was too large with the number of existing beds in the area.

---

[1] Minn. St. 144.51 requires that a license be obtained from the State Board of Health in order to operate a nursing home.

The Board of Health regulations relating to construction of new or additions to existing nursing home facilities, which were effective prior to passage of the Minnesota Certificate of Need Act, include the following:

"10563 SUBMISSION OF PLANS

"(a) Preliminary Plans. When construction is contemplated, either for new buildings, or for additions or material alterations to existing buildings, the preliminary plans or sketch shall be submitted to the board for review and approval before the preparation of working drawings. The preliminary plans shall be drawn to scale and shall indicate the assignment of all spaces, sizes of areas and rooms, and the location and kind of fixed equipment.

"(b) Final Working Drawings and Specifications. Before construction is begun, plans and specifications in duplicate covering the construction of new buildings, additions, or material alterations to existing buildings shall be submitted to and approved by the board as to compliance with the nursing home or boarding care home regulations. These plans shall show the general arrangement of the building, including a room schedule and fixed equipment of each room, together with such additional pertinent information as the board may require."

In March of 1971, plaintiffs contacted the board and again were advised of the "board policies"[2] which prohibited plan review at that time.

After obtaining a new architect, Mr. Uldis Treibergs, plaintiffs once more attempted to initiate plan review dialogue with defendants in June of 1971. Again the request was denied on "policy" grounds.

Plaintiffs renewed their request for plan review at a meeting with board staff members held on July 20, 1971. Dr. Knudsen once more cited the Richview problems and plaintiffs' failure to submit their proposal to the Metropolitan Health Board as impediments to plan review.

As the statutory deadline of September 1, 1971, drew near, plaintiffs' counsel sent the board a set of preliminary plans accompanied by a letter requesting in rather firm language that the board review these plans in short order, and on August 31, 1971, informed the board that plaintiffs had commenced construction on that day. On September 8, 1971, defendant Dr. Warren R. Lawson, secretary and executive officer of the board, informed plaintiffs' counsel that the plans submitted had been reviewed prior to the deadline. This was confirmed by plaintiffs' receipt of a written plan review, called a construction memorandum, dated August 30, 1971. On September 15, 1971, Dr. Lawson wrote plaintiffs a letter advising that the commencement of construction in advance of approval of *final* plans was in violation of Regulation 10563(b), quoted in footnote 1, *supra.* Dr. Lawson further *strongly advised plaintiffs to cease construction immediately.*

---

[2] These "policies" were: (1) The practice of the Department of Health not to review new plans for construction of or addition to a nursing facility until at least 6 months after it has been assured that noticed deficiencies in nursing homes under the same ownership or management have been corrected; (2) Submission of the proposal to the appropriate areawide health planning agency, in this case the Metropolitan Health Board, for analysis in terms of *need* prior to reviewal by the Department of Health.

The construction commenced by plaintiffs on August 31 consisted of excavating an area approximately 40 feet by 56 feet and pouring one 10-foot by 2-foot by 1-foot concrete footing. The excavation constituted approximately 20 percent of the total excavation required under existing plans. The cost of the above work was $420.

In October of 1971, staff members of the board visited the site of the Hopkins project. Thereafter, on November 11, 1971, the board adopted the following resolution:

"[A]ssuming that the area 30 by 70 is actually the excavation for the nursing home structure, it is the position of the Minnesota State Board of Health that the proposed nursing home under consideration be considered *not* within the scope of the Minnesota Certificate of Need Act, Chapter 628, Minnesota Session Laws 1971, and that the Board will license this facility upon proper application, provided that this facility meets all regulations of the Board pertaining to nursing homes."

The above decision was communicated to plaintiffs by letter dated November 15, 1971. This same letter stated that "final working drawings and specifications must be submitted to this office and approved before construction is continued."

The record clearly shows that from November 1971 to May of 1972 the board and plaintiffs' architect proceeded to develop the preliminary plans. On April 12, 1972, general approval of these plans was given by the board staff. Plan development continued and formal preliminary approval was transmitted to plaintiffs on May 5, 1972. There is little evidence in the record to show that plaintiffs and the board staff engineers were not working diligently to complete the plan review process in the time span between November 1971 and May 1972.

The first evidence of discord appears in a memorandum, dated May 5, 1972, written by Dr. Knudsen, expressing some doubt as to whether plaintiffs had secured a building permit or financing. At the next board meeting, May 19, 1972, although it was not

listed on the agenda, these questions about zoning and financing problems were raised and it was proposed that the board reconsider its previous decision exempting plaintiffs from the Certificate of Need Act. The board voted to have the staff investigate the matter. On June 8, 1972, the Certificate of Need Committee, acting under board authorization, voted to require plaintiffs to obtain a certificate of need for the Hopkins project. On the following day, Dr. Lawson sent a letter to plaintiffs informing them of this change in the board's position and citing plaintiffs' failure to obtain conditional-use and building permits as reasons for the board's decision.

Attempts by plaintiffs to get the Board of Health to reconsider its latest action were met without success and they brought this lawsuit. Plaintiffs, in this action, sought to have the proposed nursing home declared exempt from the Certificate of Need Act, and, in the alternative, if the Certificate of Need Act is held to apply to them, they allege that the act is unconstitutional as being invalid under the Fourteenth Amendment to the United States Constitution, and, further, that they were denied due process of law.

It is clear from the record that plaintiffs did engage in serious negotiations with the Department of Health for over a year prior to the September 1, 1971, effective date of the Certificate of Need Act. They, in fact, had hired an architect who commenced work in the fall of 1970. This was in addition to the excavation and footings being poured in August of 1971.

Two pertinent sections of the Certificate of Need Act read as follows:

Minn. St. 145.73 (L. 1971, c. 628, § 3). "No construction or modification of a health care facility, whether public, non-profit, or proprietary, shall be commenced unless a certificate of need has been issued therefor in accordance with sections 145.71 to 145.83."

L. 1971, c. 628, § 14. "This act shall apply to architectural, professional consultation, or fund raising services engaged after

September 1, 1971, to health care facilities construction or modification commenced after September 1, 1971 and to proposals for health care facilities approved for federal or state financial assistance after July 1, 1971."

Both plaintiffs and defendants have cited numerous cases in support of their arguments that construction was or was not commenced prior to the September 1, 1971, deadline. However, in view of the fact that this issue is controlled by § 14, quoted above, the cases cited are not relevant to the present inquiry.

We find no compelling reason either in law or in fact to support defendants' contention that § 14 should be strictly construed against plaintiffs. Rather, it appears that the legislature, by establishing the period of grace, intended to allow those who had projects in process to proceed to completion without first having to obtain a certificate of need. We also note that § 14 does not establish commencement of construction as the sole factor to be considered in determining whether or not a given project falls within the ambit of the Certificate of Need Act. In the instant case, architectural work had been commenced well in advance of the statutory deadline. Actual physical construction was also begun prior to that time. In view of those facts, we hold that plaintiffs are excluded from the purview of the Certificate of Need Act because they had developed their project to a sufficient degree prior to the effective date thereof.

Having decided that no certificate of need is required by plaintiffs, we need not rule on the constitutionality of the act itself. We do, however, feel compelled to comment on plaintiffs' claim that the department acted improperly in delaying their application, and by raising reasons for denying review of the same, namely, claiming that the plaintiffs had not shown they had the necessary financing or zoning clearances from the city of Hopkins, and that Hellman's existing operation at Richview had many deficiencies.

The zoning and financing questions were, in our opinion, not

really relevant because the trial court itself, in its lengthy memorandum prior to its findings, said:

"In fairness to the plaintiffs, the Court states that, on the evidence before it, it has no question personally but that the following are true: The plaintiffs would not proceed with the project without benefit of outside financing; but the individual plaintiffs together are financially able to proceed with it on their own. Within a reasonable time, they could obtain outside financing now. They are able businessmen who are capable of operating the proposed home in conformity with all requirements of the Board and Department of Health. The City of Hopkins would, within a reasonable time, cooperate to provide them with whatever zoning changes may be necessary. The City would grant a building permit when, as and if proper final plans and specifications are submitted to it."

Moreover, if the plaintiffs could not get financing or the necessary zoning changes, it is obvious they could not build, so we do not see what concern this would be to the Department of Health.

Insofar as using deficiencies in the Richview Nursing Home as grounds or reasons for delaying consideration of plaintiffs' application, it is the clear duty of the Department of Health to use existing laws to properly discipline Hellman and to consider the license of the Richview Nursing Home in the light of those statutes and any regulations that may be properly adopted. We feel compelled further to point out that any regulations of the Department of Health referred to by the department in any proceedings are subject to the Administrative Procedure Act, Minn. St. 15.01 to 15.41, and must be promulgated in accordance with that act. A person dealing with the department is entitled to proper notice of what regulations are being promulgated and are applicable to him. The purpose of the Administrative Procedure Act is to ensure that we have a government of law and not of men. Under that act, administrative officials are not permitted to act on mere whim, nor their own impulse, however

well-intentioned they might be, but must follow due process in their official acts and in the promulgation of rules defining their operations.

Reversed and remanded.