529 N.W.2d 438 (1995)
SuAnne DULLARD for Rita Dullard, Petitioner, Appellant,
v.
MINNESOTA DEPARTMENT OF HUMAN SERVICES, Respondent, and
Itasca County Human Services, Respondent.
No. CO-94-820.
Court of Appeals of Minnesota.
March 28, 1995.
*440 Timothy W. Ridley, Joseph W.E. Schmitt, Julie L. Levi, Meagher & Geer, Minneapolis, for appellant.
Hubert H. Humphrey, Atty. Gen., William H. Mondale, Asst. Atty. Gen., St. Paul, for respondent Minnesota Dept. of Human Services.
John J. Muhar, Itasca County Atty., Michael J. Haig, Asst. Itasca County Atty., *441 Grand Rapids, for respondent Itasca County Human Services.
Considered and decided by RANDALL, P.J., and KLAPHAKE and DAVIES, JJ.

OPINION
RANDALL, Judge.
SuAnne Dullard, on behalf of her mother Rita Dullard, appealed from the Itasca County Welfare Board's decision denying Rita Dullard medical assistance benefits. The state agency held a hearing and the appeals referee recommended affirming the decision of the county agency. The Commissioner adopted the referee's recommendation and denied medical assistance benefits. The Dullards appealed this decision to the Itasca County District Court, and the district court affirmed. The Dullards appeal to this court. We reverse and remand.

FACTS
In June 1991, Rita Dullard was institutionalized in Illinois. Her husband is John Dullard. SuAnne Dullard is the couple's daughter. Rita Dullard applied for Medicaid benefits under the Illinois Medicaid state plan. At the time of her application, Rita and John Dullard had assets worth $75,121. At that time, under the Illinois Medicaid state plan, the institutionalized spouse could retain $66,480, the maximum allowable under the federal Medicaid Act.[1] John Dullard spent down the couple's assets to qualify for Illinois Medicaid benefits. After the spend down, Rita Dullard qualified for the Illinois Medicaid program, and John Dullard retained assets worth $59,221.59.
In August 1992, the Dullard family considered relocating Rita Dullard to Minnesota, to live closer to SuAnne Dullard, and in anticipation of Rita receiving better care. SuAnne Dullard spoke with Mel Bartz, eligibility specialist from Itasca County Human Services. Dullard and Bartz spoke in general terms, and Bartz stated that if a person is eligible for Medicaid benefits in one state, he thought the person would also be eligible in another state. Bartz testified that he was not aware Rita Dullard was married, and was not aware of the couple's assets.
SuAnne Dullard placed Rita Dullard in an Itasca County nursing home. Rita Dullard was out of a nursing home only part of one day in transit to Minnesota. Otherwise, she has been institutionalized continuously. SuAnne Dullard applied for Minnesota medical assistance benefits (MA benefits) on her mother's behalf.
Minnesota's Medicaid state plan contains lower limits for eligibility (you get to keep less of your money to qualify) than Illinois' plan. Under Minnesota's plan, a community spouse may retain assets equal to the state's maximum allotment only when the amount of assets deemed available to the institutionalized spouse also equals the state's maximum.[2] Therefore, the community spouse in Minnesota can only retain the state's maximum community spousal allotment if the community spouse's and institutionalized spouse's assets together equal twice the cap on the community spouse's assets.
Itasca County Human Services conducted an asset assessment as was performed in Illinois, and pooled the couple's assets. The state determined that Rita Dullard had total countable assets of $57,281.77, with an estimated spousal share of $28,640.89, an amount in excess of the limit allowable to qualify for Minnesota MA benefits.
The Dullards appealed this determination and argued that under the federal Medicaid Act, once an asset assessment had been conducted in Illinois, once there had been a spend down to qualify, and once Rita Dullard qualified for Medicaid benefits, John Dullard's assets could no longer be pooled with Rita Dullard's, or deemed available to her. The referee recommended that the Commissioner of the Minnesota Department of Human Services (DHS) affirm the decision of Itasca County Human Services. The Commissioner adopted the referee's recommendation and later declined to modify the decision. *442 The Dullards appealed the Commissioner's decision to the district court, which affirmed. The Dullards then appealed to this court.
After the Dullards appealed to this court, DHS provided the Dullards with a copy of a letter from the federal Department of Health and Human Services (the federal DHHS) dated October 27, 1993. The federal DHHS's interpretation of the federal Medicaid statutes was similar to the Dullard's interpretation, but allowed for some flexibility of state interpretation.

ISSUES
1. Does the prohibition on twice deeming the community spouse's income or assets available to the continuously institutionalized spouse continue after the institutionalized spouse moves across state lines and applies for medical assistance benefits under Minnesota's Medicaid state plan?
2. Are the referee's findings of fact unsupported by the record as a whole?

ANALYSIS
Where the district court reviewing an agency decision makes independent factual determinations, acting as a court of first impression, this court applies the "clearly erroneous" standard of review. In re Occupational License of Hutchinson, 440 N.W.2d 171, 175 (Minn.App.1989), pet. for rev. denied (Minn. Aug. 9, 1989). But where the district court itself acts as an appellate court regarding the agency decision, this court will independently review the agency's record. Id. Here, the district court reached its decision on the meaning of the federal and state statutes in an appellate capacity. Thus, this court conducts a de novo review of legal issues, and is not bound by the legal conclusions of the district court or of the agency. Id.

1. Deeming Community Spousal Assets Available
The Dullards argue the federal Medicaid statute unambiguously provides that states may conduct an asset assessment only once, at the beginning of the first continuous period of institutionalization, and that thereafter, other states may not deem the community spouse's assets available to the institutionalized spouse. DHS disagrees, and seeks deference for its interpretation. This issue appears to be a case of first impression in Minnesota.
DHS argues that Rita Dullard began a "new" continuous period of institutionalization when she entered a Minnesota institution. Thus, DHS claims it can conduct an asset assessment de novo, include appreciation of Dullard's assets since the first assessment in Illinois, and argues it may again hold John Dullard's assets available to Rita Dullard, and require a second spend down to qualify for MA benefits. DHS states that
because federal law allows states flexibility in creating plans to govern their Medicaid programs, it was not error for the Commissioner and the district court to approve of the reasonable interpretation that "first continuous period of institutionalization" means first within the authority of Minnesota's state plan.
DHS thus concedes that it is interpreting the statute, and seeks deference for its interpretation.
The Medicaid program is a cooperative state-federal program, established by Title XIX of the Social Security Act (42 U.S.C.A. § 1396 et seq. (West Supp.1994)). Whitehouse v. Ives, 736 F.Supp. 368, 370 (D.Me. 1990). The program is intended to provide medical assistance to medically needy people. The federal government shares the cost of the program with the states that elect to participate in the program. In return, the participating states must comply with requirements imposed by the Medicaid statute and regulations promulgated by the Secretary of the federal Department of Health and Human Services. Id. (citing Atkins v. Rivera, 477 U.S. 154, 156-57, 106 S.Ct. 2456, 2458, 91 L.Ed.2d 131 (1986)).
Before 1988, in determining the extent of medical assistance the states could consider only income and resources that were "available" to a Medicaid applicant. Id. (citing 42 U.S.C. § 1396a). Federal regulations prior to 1988 set out the financial eligibility guidelines and what income and resources were *443 "available" to an applicant. Id. Problems arose under this system, however, and the non-institutionalized spouse (called the community spouse) sometimes was left without sufficient assets or income to maintain himself or herself.
The federal statute at issue is meant to address the issue of spousal impoverishment. The major portion of the statute was enacted as part of the Medicare Catastrophic Coverage Act of 1988, P.L. 100-360 (1988 Act). The 1988 Act made substantial changes in the treatment of the community spouse's resources for "deeming" purposes. Brown v. Magnant, 773 F.Supp. 1164, 1170 (S.D.Ind. 1990).
Under the federal statute, all the resources held by either spouse are considered available to the institutionalized spouse, except that the community spouse can keep the greatest of $12,000 or the spousal share, but not more than $60,000. 42 U.S.C.A. § 1396r-5(f)(2) (West Supp.1994).[3] The spousal share is one-half of the couples total resources. 42 U.S.C.A. § 1396r-5(c)(1) (West. Supp.1994). Once eligibility for Medicaid is established, no income or other resources of the community spouse can thereafter be deemed available to the institutionalized spouse. 42 U.S.C.A. §§ 1396r-5(b)(1); 1396r-5(c)(4) (West Supp.1994); Brown, 773 F.Supp. at 1171.[4]
The Dullards argue that the statute unambiguously provides that the asset assessment may occur only once, at the beginning of the first continuous period of institutionalization, and that after the institutionalized spouse becomes eligible for benefits, the community spouse's assets may never be considered again or deemed available to the institutionalized spouse for any purpose. They cite 42 U.S.C.A. §§ 1396r-5(c)(1)(A) and 1396r-5(c)(4) in support of their argument.
In response, DHS argues that the "beginning" of the "first" continuous period in this case is when Rita Dullard applied for MA benefits in Minnesota. According to DHS, once Rita Dullard moved to Minnesota from Illinois, she began a new "first" continuous period of institutionalization. DHS's reading of the statute is that it may pool the couple's assets under an asset assessment because *444 the couple is at the beginning of the first continuous period of institutionalization in Minnesota.
DHS cites Minnesota's statute, arguing that the statute provides authority for its position:

At the beginning of a continuous period of institutionalization of a person, at the request of either the institutionalized spouse or the community spouse, or upon application for medical assistance, the total value of assets in which either the institutionalized spouse or the community spouse had an interest at the time of the first period of institutionalization of 30 days or more shall be assessed and documented and the spousal share shall be assessed and documented.
Minn.Stat. 256B.059, subd. 2 (1992) (emphasis added). The statute also provides
After the month in which the institutionalized spouse is determined eligible for medical assistance, during the continuous period of institutionalization, no assets of the community spouse are considered available to the institutionalized spouse.
Minn.Stat. 256B.059, subd. 5(c) (1992).
DHS focuses on the language "or upon application for medical assistance" as authority for its position that when Rita Dullard applied for benefits in Minnesota, the Itasca County Human Services Department could assess the couple's assets together, and again (as did Illinois) deem John Dullard's assets available to Rita Dullard, and require a spend down.
From the face of the statute, it is not clear that DHS's self-serving interpretation is correct. The term, "or upon application for medical assistance" does trigger an asset assessment, but it does not state that DHS should assess the couple's assets on that date of application. Although not the model of clarity, the statute provides that DHS shall assess the total value of the assets the couple held at the time of the first period of institutionalization of 30 days or more. Therefore, although the date of application may come later than the initial date of institutionalization (for example where the spouse is institutionalized but does not apply for benefits until later), upon application DHS shall assess the value of the couple's assets as of the initial date of institutionalization.
The federal and state statutes do not address the situation where the institutionalized spouse qualifying for Medicaid benefits under one state's state plan moves to a different state. There is nothing on the face of either statute drawing any distinction between an institutionalized spouse who remains in the same state and one who moves to a new state. Because the statutes themselves do not provide for the situation where an institutionalized spouse moves across state lines, there is a gap resulting in an ambiguity.
The Dullards argue that by stating "beginning of the first continuous period of institutionalization," the federal statute unequivocally states that the assessment should only be conducted the very first time the spouse is institutionalized for a continuous period of time. A statute must be enforced literally if its language embodies a definite meaning which involves no absurdity or contradiction. Peterson v. Halvorson, 200 Minn. 253, 256, 273 N.W. 812, 813 (1937).
We conclude the Dullards' narrow interpretation is incorrect. Under the Dullards' argument, once a state performs an asset assessment, all other states are forever bound by this assessment, and a community spouse's assets could never again be considered for any purpose. This interpretation could unfairly benefit couples moving from states with higher eligibility limits to states with lower eligibility limits, as is the case here with Minnesota.
There is no claim in this case that the Dullards shopped for a high eligibility state like Illinois, qualified, and then quickly and intentionally moved to Minnesota just for monetary reasons. Rather, the record shows the Dullards had bona fide reasons for qualifying and first receiving MA in Illinois, and now have bona fide reasons for moving to Minnesota and for wishing to protect the modest estate they have left. However, we have a deep concern that the inflexible interpretation the Dullards urge on this court would create a true incentive to "shop for a *445 high eligibility state to qualify in" and then move to the state of your choice and claim your assets are forever protected from that state's spend down requirements.
At the same time, we conclude DHS is incorrect in its argument that the original asset assessment is totally irrelevant when one changes states. According to DHS, even though in reality a person is continuously institutionalized, once the institutionalized spouse moves across state lines the person begins a "new" first continuous period of institutionalization. Under DHS's interpretation, it could deem the community spouse's assets, as of the date the institutionalized spouse enters the Minnesota facility, available to the institutionalized spouse. DHS would pool not only the community spouse's share from the original asset assessment, but also any appreciation on the community spouse's spousal share. This interpretation would place an unfair burden on couple's moving from other states to Minnesota.
The first issue to be resolved is whether to give deference to the DHS's interpretation. The Dullards argue that as an unpromulgated rule, DHS's interpretation of the federal and state statutes is invalid. DHS responds that it made a "reasonable interpretation" of the pertinent statutes. An agency must adopt, amend, suspend, or repeal rules in accordance with MAPA rulemaking procedures, and only pursuant to the agency's statutory authority. Minn.Stat. § 14.05, subd. 1 (1992). All rules, including interpretive rules, must be promulgated according to the MAPA. St. Otto's Home v. Dep't of Human Serv., 437 N.W.2d 35, 42 (Minn.1989). Interpretive rules are rules promulgated to make specific the law enforced or administered by the agency. Id. The agency's interpretation here tends to make the federal and state statutes more specific, and therefore is an interpretive rule.
Once promulgated, every rule, "regardless of whether it might be known as a substantive, procedural, or interpretive rule * * * shall have the force and effect of law." Minn.Stat. § 14.38, subd. 1 (1992). Failure to follow the procedures of the MAPA, however, generally invalidates the rule. St. Otto's Home, 437 N.W.2d at 43. If the agency has failed to promulgate a rule according to MAPA procedures, but has correctly interpreted a statute, the agency action may still be upheld if the agency action was otherwise proper. Id. at 43-44.
In St. Otto's Home, the supreme court stated:
The issue, however, is not whether [the agency] followed proper rulemaking procedures in issuing its policy statement but whether it correctly interpreted and applied the statutory provisions in this case. That [the agency] may have articulated its construction of a statute in a rule improperly promulgated does not render a correct interpretation incorrect. While slavish adherence to a defective rule might well prove troublesome, [the agency] recognizes that, unlike a properly promulgated rule, its policy statement does not have the force and effect of law. The statement expressly notes that in each case the policy set out in the statement will merely provide the starting point for deliberation, "but the final decision will depend upon the facts of the case."
Id. at 43-44 (citations omitted) (quoting In re Peoples Natural Gas Co., 389 N.W.2d 903, 906 (Minn.1986)). The supreme court also clarified that it did not state that "if the agency's interpretation of a statute or rule is correct, it is irrelevant that the rule was improperly promulgated." Id. at 44.
Agencies may also develop policy in a case-by-case method through adjudication of contested cases. Bunge Corp. v. Commissioner of Revenue, 305 N.W.2d 779, 784 (Minn.1981); Minnesota Chamber of Commerce v. Minnesota Pollution Control Agency, 469 N.W.2d 100, 105 (Minn.App.1991), pet. for rev. denied (Minn. July 24, 1991); In re Hibbing Taconite Co., 431 N.W.2d 885, 894 (Minn.App.1988). It is inappropriate, however, for agencies to adopt policy in a case-by-case method covering issues of broad social and political importance. In re Appeal of Jongquist, 460 N.W.2d 915, 917 (Minn. App.1990). As quoted in Jongquist,
The purpose of the Administrative Procedure Act is to ensure that we have a government of law and not of men. Under *446 that act, administrative officials are not permitted to act on mere whim, nor their own impulse, however well intentioned they might be, but must follow due process in their official acts and in the promulgation of rules defining their operations.
Jongquist, 460 N.W.2d at 917 (quoting Monk & Excelsior, Inc. v. Minn. State Board of Health, 302 Minn. 502, 509-10, 225 N.W.2d 821, 825 (1975)).
Because the decision not to respect an asset assessment from another state is of broad social importance, affecting the rights of institutionalized spouses moving to Minnesota from anywhere else in this country, the case-by-case method of policy making is not appropriate. Therefore, the agency action here should only be promulgated in compliance with the MAPA.
DHS has expressed its policy not to honor the asset assessments from other states. A policy statement does not necessarily have to be a written statement in order to be held a rule; agency actions can also satisfy the definition of a rule. See White Bear Lake Care Center v. Minn. Dep't of Welfare, 319 N.W.2d 7, 8-9 (Minn.1982) (agency practice of computing cost changes on per diem basis); Ebenezer Soc'y v. Minn. Dep't of Human Services, 433 N.W.2d 436, 438 (Minn.App.1988) (agency reclassification of food categories); In re Application of Orr, 396 N.W.2d 657, 663 (Minn.App.1986) (unofficial moratorium on harbor development). Because DHS's interpretation of the federal and state statutes was not promulgated pursuant to the MAPA, it is not binding on this court. St. Otto's Home, 437 N.W.2d at 43. The interpretation may, however, be given weight as the agency's interpretation of the state statute. Reserve Mining Co. v. Herbst, 256 N.W.2d 808, 824 (Minn.1977).[5]
Next, in interpreting the federal statute, there is some evidence in the legislative history of the statute that sheds light on its meaning. As both parties point out, under the original 1988 Act, the language of the statute was "a continuous period of institutionalization" instead of "the first continuous period of institutionalization." Compare 42 *447 U.S.C. § 1396r-5(c) (1988) with 42 U.S.C.A. § 1396r-5(c) (West Supp.1994). The change of the statute appears to imply that Congress intended to limit when a state could conduct an asset assessment to only the first continuous period of institutionalization, rather than each time a person is re-institutionalized after a gap.[6]
Documents in the Congressional Record also shed some light on the meaning of the federal statute. One document states
Provisions Relating to Spousal Impoverishment.  Includes clarifying amendments to spousal impoverishment provisions of Medicaid law: Provides that the assessment and allocation of a couple's resources is to occur only at the beginning of the first continuous period of institutionalization.
Omnibus Budget Reconciliation Act of 1990, H.Conf.Rep. No. 964, 101st Cong., 2d Sess. 872 (1990), reprinted in 1990 U.S.C.C.A.N. 2374, 2577.[7]
The legislative materials indicate that initially, Congress intended that at the beginning of each continuous period of institutionalization, the state would assess the couple's assets, and could deem the community spouse's assets available to the institutionalized spouse. In the later amendments, however, the materials talk in terms of clarifying that the asset assessment should occur at the beginning of the first continuous period of institutionalization.
As discussed above, a facial reading of the federal and state statutes does not support DHS's interpretation. Further, evidence in the legislative history appears to raise significant questions regarding DHS's interpretation. The federal agency's interpretation is somewhat consistent with the face of the federal statute and its legislative history, and tends to favor the Dullard's interpretation. We also recognize there are important policy considerations to be taken into account in addressing the treatment of institutionalized spouses moving from one state to another.
We conclude the correct interpretation of the statute is that when an institutionalized *448 spouse moves from another state to Minnesota during a continuous period of institutionalization, Minnesota may conduct its own asset assessment, but that it may only consider the assets of the couple as of the first continuous period of institutionalization in the other state. This interpretation treats persons institutionalized only in Minnesota as well as those persons first institutionalized in another state who then move to Minnesota.
When an institutionalized spouse receiving Medicaid benefits chooses to move to Minnesota, and that move occurs during a continuous period of institutionalization, Minnesota can recalculate assets if it wishes, but it may only consider the couple's assets as of the beginning of the continuous period of institutionalization.[8] Then, using that figure, Minnesota can apply its own asset limits. This formula insures that a couple is not unfairly penalized for moving from one state to another and the rule insures that once assets are calculated and then spent down to qualify, the community spouse's remaining assets and their appreciation belong to him or her. Also, this formula insures that couples receive credit for any amounts already spent down in the first state.
The effect of DHS's argument is that any appreciation in assets John Dullard received after complying with the Illinois spend down rules must again be spent down in Minnesota. We conclude this is not consistent with the statute or with policy.
We interpret the operative federal and state statutes so that once a community spouse has spent down assets, the community spouse's assets may not be deemed available to the institutionalized spouse even if the assets appreciate greatly in value. 42 U.S.C.A. § 1396r-5(c)(4); Minn.Stat. § 256B.059, subd. 5(c). In its Minnesota asset assessment, DHS may not consider any appreciation of the assets John Dullard retained after the initial asset determination and spend down in Illinois.
Further, in the situation where the institutionalized spouse moves from another state, if the community spouse's assets have deteriorated since the initial eligibility determination, Minnesota must treat the couple in the same manner as it treats similarly situated couples where one spouse has been institutionalized only in Minnesota. Minnesota cannot impute to the community spouse assets that he or she does not in fact have.
Our conclusion puts the Dullards in exactly the same position as if Rita Dullard had become institutionalized in Minnesota originally rather than in Illinois. If Minnesota could conduct an asset assessment de novo, and then impose an additional spend down, then the Dullards would not only be in a worse position than they were in Illinois, but they would also be in a worse position than they would have been if they had applied initially in Minnesota. Our decision only requires DHS to treat those institutionalized spouses moving to Minnesota from other states in the same manner as it treats those who have been institutionalized only in Minnesota.[9]

2. Referee's Findings of Fact
The Dullards also raise issues regarding the referee's findings of fact. The Dullard's state that they relied on representations of Mel Bartz of the Itasca County Human Services. In its brief, Itasca County Human Services argues that the elements of equitable estoppel are not met. The referee's finding that there was no affirmative misconduct on the part of the county is supported by *449 substantial evidence in view of the entire record. See In re Hibbing Taconite, 431 N.W.2d 885, 889 (Minn.App.1988).
The Dullards are correct, though, that the referee's findings were not supported by the evidence in the record as to the amount of the Dullards' assets and whether they spent down part of their assets. The referee found that the Dullards originally had assets of $59,221.59 and that they did not have to spend down their assets to qualify for Illinois Medicaid benefits. Instead, the record shows the Dullard's assets equaled $59,221.59 after they spent down their assets to qualify for Illinois Medicaid benefits.

DECISION
The trial court erred in its conclusions of law. The prohibition on twice deeming the community spouse's assets available to the continuously institutionalized spouse continues after the institutionalized spouse moves across state lines and applies for medical assistance benefits under Minnesota's Medicaid state plan. DHS must determine eligibility for medical assistance benefits using the asset assessment from the first continuous period of institutionalization, applying a credit for any spend down of assets. DHS may not consider any appreciation of the community spouse's assets, but must consider deterioration of those assets. Using this formula, DHS can then apply Minnesota asset limits in determining eligibility for medical assistance benefits under Minnesota's state plan.
Reversed and remanded.
NOTES
[1] See Ill.Ann.Stat. ch 305 para. 5/5-4 (Smith-Hurd 1993).
[2] See Minn.Stat. § 256B.059, subd. 3 (1992).
[3] The dollar amounts are increased by the percentage increase in the consumer price index. 42 U.S.C.A. § 1396r-5(g) (West Supp.1994).
[4] The federal statute provides in relevant part:

(c) Rules for treatment of resources
(1) Computation of spousal share at time of Institutionalization
(A) Total joint resources
There shall be computed (as of the beginning of the first continuous period of institutionalization (beginning on or after September 30, 1989) of the institutionalized spouse) 
(i) the total value of the resources to the extent either the institutionalized spouse or the community spouse has an ownership interest, and
(ii) a spousal share which is equal to ½ of such total value.
(B) Assessment
At the request of an institutionalized spouse or community spouse, at the beginning of the first continuous period of institutionalization (beginning on or after September 30, 1989) of the institutionalized spouse and upon the receipt of relevant documentation of resources, the State shall promptly assess and document the total value described in subparagraph (A)(i) and shall provide a copy of such assessment and documentation to each spouse and shall retain a copy of the assessment for the use under this section. * * *.
(2) Attribution of resources at time of initial eligibility determination
In determining the resources of an institutionalized spouse at the time of application for benefits under this subchapter, regardless of any State laws relating to community property or the division of marital property 
(A) except as provided in subparagraph (B), all the resources held by either the institutionalized spouse, community spouse, or both, shall be considered to be available to the institutionalized spouse, and
(B) resources shall be considered to be available to an institutionalized spouse, but only to the extent that the amount of such resources exceeds the amount computed under subsection (f)(2)(A) of this section (as of the time of application for benefits)
* * * * * *
(4) Separate treatment of resources after eligibility for benefits established
During the continuous period in which an institutionalized spouse is in an institution and after the month in which an institutionalized spouse is determined to be eligible for benefits under this subchapter, no resources of the community spouse shall be deemed available to the institutionalized spouse.
42 U.S.C.A. § 1396r-5 (West Supp.1994) (emphasis added).
[5] The Dullards argue that the letter from the federal DHHS should bind DHS and this court. While the federal DHHS indicates that the states have some flexibility in interpreting the statute, it states its own interpretation:

We have interpreted a "continuous period of institutionalization" to end if an individual is absent from an institution for at least 30 consecutive days. The individual need not remain in the same institution or in an institution in the same State to sustain the same continuous period of institutionalization. Therefore, if an institutionalized individual leaves the State in which he or she has been found eligible under section 1924 and moves to an institution in another State, we would still regard the period of institutionalization as continuous. As a result, the second State would not carry out any of the requirements under section 1924 which would apply if the individual had just begun a new continuous period of institutionalization. Thus, the state would not calculate a new PRA [Protected Resource Amount] for the community spouse.
Under the statute at section 1924(c)(4), during the continuous period in which an institutionalized spouse is in an institution, and after the month in which the institutionalized spouse is determined to be eligible for Medicaid, no resources of the community spouse are deemed to be available to the institutionalized spouse. We believe this means, after the initial eligibility determination, a State cannot "pool" a couple's resources or calculate a PRA, but must consider the institutionalized spouse's resources separately when it redetermines his or her eligibility. If an institutionalized individual moves to a new State after his or her initial eligibility determination, but remains continuously institutionalized, the rule in section 1924(c)(4) should apply. As such, the new State would consider the institutionalized spouse's resources separately, and there would be no PRA. When the second State determines the institutionalized individual's eligibility, it should use the redetermination rules under its own State plan. The State would use the redetermination rules as long as the institutionalized spouse remains continuously institutionalized.
(Letter from David DuPre, Acting Associate Regional Administrator, Division of Medicaid, to Helen M. Yates, Assistant Commissioner, Health Care Administration, Minnesota Department of Human Services of Oct. 27, 1993, at 4) (emphasis added).
We conclude this letter is not binding on our construction of the federal and state statutes, although it should be given weight as the federal agency's informal interpretation of the federal statute. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) ("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer").
[6] DHS notes that its current policy is to only conduct one asset assessment for people who have only been institutionalized in Minnesota. This policy is consistent with both the federal and state statutes.
[7] One document explains that the amendment of the original 1988 language

[c]larifies that, with respect to determining the income and resources for institutionalized individuals with spouses in the community, State community property laws apply to redeterminations of eligibility (but not to the post-eligibility treatment of income). Also clarifies that the computation of the spousal share occurs only once, at the beginning of the first continuous period of institutionalization.
Report on the Activity of the Committee on Energy and Commerce, H.R.Rep. No. 1021, 101st Cong., 2d Sess. (1990), 1991 WL 4354 (Leg. Hist.). Another document states:
One-Time computation of spousal share.  Under current law, the total value of the resources in which either spouse has an ownership interest is computed as of the beginning of a continuous period of institutionalization of the institutionalized spouse. The Committee bill would clarify that this computation is to occur only once, at the beginning of the first continuous period of institutionalization.
Omnibus Budget Reconciliation Act of 1989, H.R.Rep. No. 247, 101st Cong., 1st Sess. 491 (1989), reprinted in 1989 U.S.C.C.A.N. 1906, 2217.
Further, legislative materials from the 1988 act are also helpful. The earlier statute provides that the states would perform the asset assessment at the beginning of "a continuous period of institutionalization." Omnibus Budget Reconciliation Act of 1987, H.R.Conf.Rep. No. 495, 100th Cong., 1st Sess. 741 (1987), reprinted in 1987 U.S.C.C.A.N. 2313-1, XXXX-XXXX, XXXX-XXXX. A more direct statement was made in the House Report:
The following rules would apply in determining the amount of countable resources at the time of application for Medicaid benefits by the institutionalized spouse. First, a determination would be made of the total value of all the countable resources held by either the institutionalized spouse, the community spouse, or both, on the day the institutionalized spouse began the continuous period of institutionalization during which he applies for Medicaid benefits.
Omnibus Budget Reconciliation Act of 1987, H.R.Rep. No. 391(I), 100th Cong., 1st Sess. 495 (1987), reprinted in 1987 U.S.C.C.A.N. 2313-1, 2313-315. Another provision states:
First, a determination would be made of the total value of all the countable resources held by either the institutionalized spouse, the community spouse, or both on the day the institutionalized spouse began the continuous period of institutionalization during which he applies for Medicaid benefits.
Medicare Catastrophic Coverage Act of 1988, H.R.Rep. No. 105(II), 100th Cong., 1st Sess. 70 (1987), reprinted in 1988 U.S.C.C.A.N. 857, 893.
[8] If the difference in the couples asset levels at the beginning of the continuous period of institutionalization and upon application in Minnesota are slight, as a practical matter DHS should find the applicant eligible and continue coverage. If, however, Minnesota chooses to conduct an asset assessment, it must return to the initial asset list established by the first state.
[9] Although not at issue here, as DHS notes in its brief, it does not conduct a new asset assessment for those spouses institutionalized only in Minnesota who have a break in their institutionalization, but who are then are re-institutionalized. This practice is consistent with both the state and federal statutory language regarding conducting an assessment at the "first continuous period of institutionalization," and "first period of institutionalization of 30 days or more." 42 U.S.C.A. § 1396r-5(c)(1); Minn.Stat. § 256B.059, subd. 2. It would appropriate for DHS to treat those moving to Minnesota as it does those initially institutionalized in Minnesota.