**In the Matter of the Rate Appeal of SLEEPY EYE CARE CENTER, et al., Relators,**

v.

**COMMISSIONER OF HUMAN SERVICES, Respondent.**

**No. C0–97–1125.**

Court of Appeals of Minnesota.

Jan. 6, 1998.

Samuel D. Orbovich, Thomas L. Skorcze-ski, Orbovich & Gartner, Chartered, St. Paul, for Relators.

Hubert H. Humphrey III, Attorney General, Paul M. Landskroener, Julie K. Harris, Assistant Attorneys General, St. Paul, for Respondent.

Considered and decided by KLAPHAKE, P.J., and DAVIES and HARTEN, JJ.

## OPINION

KLAPHAKE, Judge.

Relators Sleepy Eye Care Center, Crystal Care Center, Maplewood Care Center, Edina Care Center, and Volunteers of America, Inc., by requesting a contested case hearing, appealed a Minnesota Department of Human Services (DHS) disallowance of certain costs claimed by relators for reimbursement under the Minnesota Medical Assistance program. *See* Minn.Stat. §§ 256B.41–.50 (1996); Minn. R. 9549.0010–.0080 (1995).[1] The ALJ recommended granting relators' motion for summary disposition. On review, the commissioner excluded all the evidence submitted by relators during the contested case hearing, rejected the ALJ's recommendation, and granted summary disposition in favor of DHS. Relators now seek judicial review by writ of certiorari. *See* Minn.Stat. § 14.63 (1996) (judicial review of contested case decision). We reverse and remand with directions.

## FACTS

Relators include four Minnesota nursing homes and their Louisiana parent corporation, Volunteers of America, Inc. (VOA). The nursing homes are owned and operated by VOA through its Minnesota-based subsidiary, Volunteers of America Health Services (VOAHS).

By December 31 of each year, nursing homes participating in the medical assistance program must submit a cost report showing various costs incurred in specified categories during the 12–month "reporting year," ending on the previous September 30. Minn. R. 9549.0041, subp. 1. DHS conducts a "desk audit" of these cost reports to ensure compliance with the rules and to set a final pay-

---

1. For convenience, the parties have cited to the 1996 version of Minnesota Statutes and to the 1995 version of Minnesota Rules. Although some of the statutes and rules governing these appeals have been amended since 1991 and 1992, none of these amendments materially affect the issues here.

ment rate. Minn. R. 9549.0041, subp. 13; Minn. R. 9549.0020, subp. 19; Minn.Stat. § 256B.421, subd. 4.

At issue in this case is the proper allocation of VOA's expenses to each of its four Minnesota nursing homes. Allocation of these central office costs[2] is governed by Minn.Stat. § 256B.432. Before this statutory allocation formula is applied, the nursing facility must subtract any non-allowable costs from its central office costs. Minn.Stat. § 256B.47, subd. 1 (listing eight general categories of non-allowable costs); Minn. R. 9549.0036 (listing 31 specific categories of nonallowable costs that must be reported). After all non-allowable costs are subtracted, the remaining central office costs are allocated pursuant to the statutory formula. To aid in this allocation, DHS recommends, but does not require, that each provider complete "Attachment D," which DHS supplies with the cost report form.

### 1991 Cost Report

In 1991, VOAHS decreased the size of its Minnesota office from 30 to 11 employees. To cover the lost expertise of these 19 employees, VOAHS claims it began to rely more on the knowledge and expertise of VOA employees located at the national headquarters in Louisiana.

Thus, for the first time, relators' 1991 cost report included a VOAHS expenditure of $231,384 for "national supervision" and allocated a portion of that amount to its Minnesota nursing homes. The desk auditor requested additional information, specifically: "Please describe the category for National Supervision. How many persons have salaries in this category? What is the salary per person?" VOAHS replied that the amount reported was the fee it paid to its parent, VOA, "for the managerial and financial support the national organization provides[.]" VOAHS further explained that the fee was calculated according to revenues generated by all its subsidiaries, including its four nursing homes. Based on this information, the desk auditor disallowed all costs claimed for "national supervision."

In their letter appealing the disallowance, relators noted that the "auditor's workpapers state [the fee was disallowed because it] was based on revenues rather than cost." Relators therefore submitted a spreadsheet based on costs that separated VOA's national office costs into various expense categories such as "salaries" and "employee benefits."

### 1992 Cost Report

In 1992, relators reported that VOAHS had spent $653,900 for "national administration" and allocated a portion to its four Minnesota nursing homes. The 1992 desk auditor again requested additional information and asked relators to provide a breakdown of the national administration costs by divisions, departments, or units. In response, VOAHS produced a document separating the national office costs into eight functional categories. The desk auditor allowed the costs reported under the "management and general" functional category, but disallowed all of the remaining national administration costs.

In their letter appealing this disallowance, relators explained that the costs were allowable because "other cost centers of our National office provide services to us in that they are necessary for the overall management and to provide efficient operations."

### Administrative Appeals

A field audit of previous years' cost reports was being conducted simultaneously with the administrative appeals of these 1991 and 1992 desk audits. DHS claims it "continued to ask questions aimed at understanding the nature of the 'national supervision' and 'national administration' costs to determine which, if any, of these costs were allowable." VOA vice president Thomas Turnbull responded by providing a collection of new spreadsheets entitled "Functional Allocation," that allocated VOA's total national office costs in fiscal years ending June 30, 1990 and 1991, to various functional categories

---

**2.** At one point both parties claimed that these disputed costs should have been considered under a rule governing the purchase of services by a nursing home from a "related organization" under Minn. R. 9549.0035, subp. 7. At the time of the contested case hearing, however, both parties were treating the costs as "central office costs," under Minn.Stat. § 256B.432 and Minn. R. 9549.0030, subp. 4.

that were also described. After reviewing this information, DHS field auditors asked Turnbull to "provide a detailed analysis of [three] VOA national office departmental accounts," including "the name of the vendor, date, cost, and a brief description of the item purchased." Turnbull eventually responded:

It is not feasible for us to provide that information to you by mail. It would be extremely time consuming to gather and copy all of the information requested and we simply do not have the staff to do so. We would, however, be happy to open our records to you on site here in [Louisiana].

DHS did not send field auditors to Louisiana.

On April 22, 1994, DHS upheld the disallowance of relators' national office costs for 1991 and the desk auditor's partial disallowance of costs claimed by relators in 1992. Relators thereafter requested a contested case hearing.

### Contested Case Hearing

In response to relators' interrogatories, DHS stated that it had disallowed all of the national administration costs claimed in 1991 "on the ground the facilities failed to follow the [allocation] methodology required by Minn.Stat. § 256B.432, subd. 3, 4, and 5." DHS further stated that it had partially disallowed relators' 1992 claimed national office costs "as not related to resident care," and that this disallowance was supported by Minn. R. 9549.0036 R (excludes fundraising costs) and Minn. R. 9549.0035, subp. 8A (requires costs to be "ordinary, necessary, and related to resident care").

In connection with its motion for summary disposition, relators submitted depositions it had taken of two DHS employees, an affidavit from Turnbull, an affidavit from VOA president Charles Gould, and an affidavit from accountant Deborah Elsey. With his affidavit, Turnbull included a completed Attachment D for each contested rate year, which followed the statutory allocation required for central office costs. In response to DHS's charge that these figures differed significantly from the previous figures provided by relators in the administrative appeals, Turnbull submitted a second affidavit explaining why his Attachment D figures dif-

fered from the initial cost report figures relators had provided.

### ALJ's Recommendation

The ALJ phrased the issue as "whether the provider presented, at the desk audit stage, reasonable documentation of claimed central office costs to render those costs allowable." The ALJ disagreed with DHS's argument that relators were "precluded from introducing any information to decide this matter that was not made available to the desk auditor." The ALJ emphasized that DHS failed to initially state that its bases for disallowing these costs was due to lack of documentation, that relators had not been clearly informed what records were needed at the desk audit stage, and that relators were not given a reasonable opportunity to present relevant information during the administrative appeal process. The ALJ concluded that summary disposition was appropriate because relators met their burden of proving that DHS's disallowances were incorrect and that the claimed costs were allowable, and because DHS presented no rebuttal evidence.

### Commissioner's Decision

On review, the Commissioner concluded that "the Facilities failed to timely provide accurate cost report information or supporting documentation." The Commissioner therefore rejected the ALJ's recommendation and granted summary disposition to DHS.

### ISSUES

I. Did the Commissioner act contrary to law by refusing to consider evidence submitted by relators during the contested case proceeding?

II. Does the review process in this case illustrate a need for new guidelines to avoid bias or the appearance of partiality?

### ANALYSIS

### I.

■ We may reverse an agency's decision if it violates the constitution, exceeds the agency's statutory authority or jurisdiction, is not supported by substantial evidence, or

is arbitrary and capricious. Minn.Stat. § 14.69(a), (b), (e), (f) (1996). The party seeking review has the burden of proving the decision violates one of these criteria. *Casper v. Itasca County Human Servs.*, 531 N.W.2d 506, 508 (Minn.App.1995).

An agency's action must be consistent with its statutes and not based on mere "whim." *Monk & Excelsior, Inc. v. Minnesota State Bd. of Health*, 302 Minn. 502, 509–10, 225 N.W.2d 821, 825 (1975). The action must reflect the agency's judgment, not its mere will. *Markwardt v. State, Water & Resources Bd.*, 254 N.W.2d 371, 374 (Minn. 1977); *REM–Canby, Inc. v. Minnesota Dep't of Human Servs.*, 494 N.W.2d 71, 77 (Minn. App.1992), *review denied* (Minn. Feb. 25, 1993). If an agency departs from past practice, it must justify that departure in the record of evidence. *In re Contested Case of Crestview Manor, Inc.*, 365 N.W.2d 387, 390 (Minn.App.1985), *review denied* (Minn. June 24, 1985).

Relators argue that the commissioner's order must be reversed because it ignores the substantial evidence in the record and fails to provide reasoned consideration to all material facts and issues. DHS counters that the commissioner properly refused to consider evidence not provided to DHS during the desk audits or administrative appeals and presented for the first time to the ALJ. However, a contested case proceeding is a de novo review, and not a mere appeal from the agency's decision. By statute, relators were required to prove by a preponderance of the evidence, that the agency's rate determination was "incorrect." *See* Minn.Stat. § 256B.50, subd. 1c. To meet this burden, contested case proceedings allow for discovery, the presentation of evidence, and the submission of summary disposition motions. *See* Minn.Stat. §§ 14.57–.62; Minn. R. 1400.5100–1400.8401. In reviewing the ALJ's recommendation, the commissioner's decision must be based on the entire record. Minn. Stat. § 14.62, subd. 1.

DHS nevertheless argues this case presents the purely legal issue of whether relators adequately documented their central office costs. DHS urges that this court adopt a rule that "when costs are disallowed for

lack of documentation, the only evidence that may be considered in the contested case is that already supplied by the provider during the desk audit or on the administrative appeal."

On desk audit, DHS may lawfully ask for explanations of how costs are allocable and disallow costs that it determines are not adequately explained. *See* Minn. R. 9549.0035, subp. 1 ("[O]nly costs determined to be allowable under [the rules] shall be used to compute the total payment rate for nursing facilities participating in the medical assistance program"); 9549.0041, subp. 3F (DHS has broad authority to require facility to supply "[o]ther relevant information necessary to support a payment request"). This assumes, however, that DHS has asked appropriate questions that are designed to ascertain whether costs are allowable, that DHS has attempted to assist the provider in complying with statutory and regulatory requirements, and that the provider is either unable to comply because records have not been adequately "maintained" or has refused to comply by failing to "provide" those records. *See* Minn. R. 9549.0036 Y. (nonallowable costs include costs "for which adequate documentation is not maintained or provided").

These basic assumptions are absent from this case: (1) DHS's original bases for disallowing relators' claimed costs were not specifically stated as lack of documentation, and this reason was not explicitly stated as a basis for the disallowances until the contested case hearing before the ALJ; (2) the desk auditors' requests for additional information were not specific enough to elicit the only documentation DHS appears to have wanted: "Attachment D"; no DHS employee ever informed relators that they would need to submit "Attachment D"; and (3) there is no evidence that relators were unable to comply or refused to comply; rather, Turnbull's letter to DHS field auditors working on previous years' cost reports that it was not feasible to provide information requested by those auditors by mail cannot be interpreted as a refusal to provide information requested on desk audits for the 1991 and 1992 cost reports, nor was Turnbull's response necessari-

ly unreasonable, given the quantity of information requested.

While the burden is on relators to provide the necessary information, the commissioner's decision fails to recognize or place any obligation on DHS to assist providers or to ensure that rates are accurately set. When deposed, two of DHS's own employees acknowledged that DHS's goal in rate-setting is to establish accurate rates and that auditors should correct identifiable errors, whether that action results in an increase or decrease in rates. Although providers are expected to be "sophisticated," this does not abrogate DHS's obligation to assist providers and set accurate rates. *Cf. In re Emmanuel Nursing Home*, 411 N.W.2d 511, 516–17 (Minn.App.1987) (because nursing homes are expected to be "sophisticated," DHS not constitutionally required to include appeal provisions in rate adjustment notices), *review denied* (Minn. Oct. 13, 1987).

DHS also argues that the commissioner properly excluded the evidence submitted in this case, particularly Turnbull's affidavits, because that evidence amounted to an untimely attempt to amend the cost reports to include costs that DHS characterizes as "entirely new" and "significantly different from those reported earlier." The rule requiring an amendment to a cost report to be made within 14 months, however, does not require a provider who is appealing previously disallowed costs to request amendment of the cost report. *See* Minn. R. 9549.0041, subp. 14. Moreover, this cost report amendment rule cannot be used to restrict the presentation of evidence during a contested case proceeding, which is governed by Minn. R. 1400.7300.

DHS finally argues that exclusion of these affidavits did not preclude relators from a meaningful opportunity to present evidence to the ALJ or otherwise violate relators'

right to due process. This argument is circular and unpersuasive because a meaningful opportunity to introduce evidence exists only if both the ALJ and commissioner are bound to consider properly presented and relevant evidence.

In conclusion, the commissioner acted contrary to law by excluding evidence presented by relators during the contested case hearing and restricted the record to the documents generated during the desk audits and administrative appeals. We therefore reverse the commissioner's decision and remand to the commissioner. On remand, the commissioner is directed to base his decision on the entire record as it existed during the contested case proceeding. At this point, we deem the record closed and not subject to further supplementation.[3]

## II.

■ Relators argue that because the commissioner's order resulted from a review process that bore a great risk of bias and the appearance of partiality, this court should provide new guidelines to the commissioner. However, they concede that there is no statutory or case law support for their position.

■ An agency must keep its advocacy and decision-making functions separate in a contested case proceeding. *See Schmidt v. Independent Sch. Dist. No. 1*, 349 N.W.2d 563, 567–68 (Minn.App.1984). Thus, an assistant attorney general who acted as advocate in a contested case may not review the commissioner's draft order in that same case before the order is issued. *Richview Nursing Home v. Minnesota Dep't of Pub. Welfare*, 354 N.W.2d 445, 460 (Minn.App.1984), *review denied* (Minn. Oct. 30, 1984). In addition, the attorney general's office maintains internal procedures designed to screen attor-

---

3. On remand, the burden of proof may strongly influence the result. As in any contested case hearing, relators must prove, by a preponderance of the evidence, that the commissioner's rate determinations were incorrect. Minn.Stat. § 256B.50, subd. 1c. Their burden may be met by proving that DHS took action that was unreasonable under the circumstances and unfair. See *St. Otto's Home v. Department of Human Servs.*, 437 N.W.2d 35, 41–42 (Minn.1989). As in the summary judgment context, once relators

meet their burden, DHS cannot prevail by relying on mere conclusory allegations and legal arguments by its attorneys. *See Phillips–Klein Cos. v. Tiffany Partnership*, 474 N.W.2d 370, 373 (Minn.App.1991). Thus, if the commissioner determines, based on the existing record, that relators have established a prima facie case, they are entitled to relief because DHS offered no rebuttal evidence to show that its actions were reasonable and correct.

ney-advocates from ex-parte contacts with attorneys advising the decision-makers.

Relators do not allege that the assistant attorneys general in this case had any improper contact or that they violated their office's internal rules or any other rules of professional conduct. Nor do they argue that the commissioner was in fact biased by the advice he received from the attorney who advised him in this case. Rather, relators insist that because an assistant attorney general assigned to advise the commissioner may inappropriately attempt to vindicate another assistant attorney general's unsuccessful strategy before the ALJ, the commissioner must either forego legal advice or seek it from outside counsel.

By statute, the attorney general must represent state agencies. Minn.Stat. § 8.06 (1996). Only when it is "necessary" may the attorney general authorize an agency to hire outside counsel to seek legal advice, and then only with the written consent of the governor and chief justice. *Id.* Thus, seeking outside counsel is reserved for extraordinary matters.

Absent any evidence of improper conduct on the part of the attorneys or any actual bias on the part of the commissioner, we decline to change the review process in this case and reject relators' invitation to provide the commissioner with new guidelines.

## DECISION

The commissioner's decision is reversed, and the matter is remanded to the commissioner.

**Reversed and remanded.**